Glenn R. EDWARDS, Appellant,

v.

UNITED STATES, Appellee.

No. 7743.

District of Columbia Court of Appeals.

Argued June 19, 1974.

Decided Oct. 13, 1976.

Rehearing en Banc Granted Jan. 12, 1977.

Frederick H. Weisberg, Washington, D. C., for appellant.

Garey G. Stark, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., Washington, D.C., were on the brief, for appellee.

Before KERN, and HARRIS, Associate Judges and REILLY, Chief Judge, Retired.

KERN, Associate Judge:

This appeal presents for our determination a narrow question: Whether a police officer who confronts a citizen on a public street late at night lacking probable cause to arrest him, but having articulable grounds to suspect him to be engaged in on-going criminal activity, may pursue him from the street into private premises when

he runs in response to the officer's request to stop and answer questions.

The facts of the case may be most accurately and comprehensively stated by quoting the testimony of Detective Jackson, the principal actor in this particular "moving street scene[s]," *United States v. Frye,* D.C.App., 271 A.2d 788, 790 (1970), and the sole witness at the pretrial hearing of appellant's motion to suppress items of personalty seized from his apartment after entry by the officer.

At about two o'clock on a March morning in the 1900 block of Savannah Street, S.E., a wholly residential area of apartment dwellings, Detective Jackson, in plain clothes, was riding with his partner, also in plain clothes, in a Plymouth sedan bearing no indicia that it was a police vehicle.

According to Detective Jackson:[1]

The first time I noticed them [appellant and his codefendant], they were walking up the street at a moderate pace (Tr. 12).

\*   \*   \*   \*   \*   \*

I recognized them carrying one stand, a tape recorder, and what appeared to be a tape player . . . [a]nd a pillow case . . . with other items in it (Tr. 9).[2]

\*   \*   \*   \*   \*   \*

I rolled down the window from the cruiser in which I was riding, and advised the subjects I was a police officer and wanted to talk to them. At this time, the two subjects . . . took off running (Tr. 7).

\*   \*   \*   \*   \*   \*

Q. So, you have no way of knowing whether they heard you.

A. No, not officially (Tr. 28).

\*   \*   \*   \*   \*   \*

Q. [Y]ou don't know whether [appellant] even knew you were a police officer . . . ?

A. That is true (Tr. 31).

\*   \*   \*   \*   \*   \*

Q. Did you have, at that time, any report of burglary in the area?

A. No, sir.

Q. Did you have any other kind of look-out for individuals meeting this description?

A. No, sir.

Q. Did you have any lookout for any property that might have been stolen, meeting any kind of description?

A. No, sir. . . . I alighted from my car, because the items they were carrying and their action of running made me curious to find out what was going on (Tr. 12). \* \* \* I . . . chased the subjects into 1920 [sic] Savannah Street.[3] . . .
[T]hey ran up a flight of stairs and pushed an apartment door open. At this time, I was directly behind them. . . . I did not engage in any conversation with them (Tr. 7).

\*   \*   \*   \*   \*   \*

[T]hey placed no key into the apartment door; they did not turn the knob to go

---

1. The following account is composed of verbatim testimony taken from various parts of the transcript of the trial of this case, arranged so as to provide a chronological narrative of events.

2. The officer, as "the subjects were proceeding on the sidewalk," (Tr. 43) estimated the dimensions of these various items to be (Tr. 37): "The stand was twelve inches in length and four by four square. . . . The tape recorder about ten inches long, ten inches

wide, and about six inches in depth. . . . The amplifier [tape recorder] about ten inches long, ten inches wide, and about six inches in depth (Tr. 37). \* \* \* The sheet appeared to have . . . smaller items . . . [b]ecause of the different lumps and bumps, you know, making different outlines contrast to the sheet (Tr. 39)."

3. The officer described (Tr. 12) this address to be "a three-story apartment building with four apartments on each floor."

in the apartment. I used the same course of action (Tr. 10–11): * * * The apartment door had come back, but it hadn't been completely closed. . . . I could see that it wasn't locked. It hadn't made connection with the facing around it to lock it (Tr. 14–15).

* * * * * *

Q. When they got to the apartment door, how far behind were you, would you say?

A. About five, six steps behind them.

* * * They were in front of me running and I could see their actions, this entire time, until they hit the apartment door and closed it (Tr. 9).

* * * * * *

Q. When you first went into the apartment . . . following these gentlemen up the stairs, did you identify yourself?

A. I don't recall, I really don't recall whether I identified myself or not (Tr. 22–23).

* * * * * *

Q. Now, when you got into the apartment, I take it you, at that time, seized the property?

A. I asked them whose property and I got no response. And at that time, I advised them that I was going to seize the property (Tr. 11).

* * * * * *

Q. Did you draw any conclusions from the nature of the property seized (Tr. 16)?

A. My conclusions were that the property seized was taken from a nursery.

Q. Why was that?

A. Because my son goes to a nursery and . . . each nursery kid . . . must take a sheet and on the sheet you write his . . . full name. And the property [a sheet] which contained the

frozen food had the name of Theresa Blackwell on the top . . . [w]here my wife usually writes my son's name . . . and [t]he type of amplifier that was taken, its [sic] not the type of amplifier a person would listen to records. It's a type of amplifier that one might speak in as a public address system. And the type of food that was wrapped [inside the sheet] and the condition of the wrap (Tr. 17).

* * * * * *

Q. Did you place anybody under arrest at that time?

A. No, I did not place anyone under arrest at that time (Tr. 11). * * * They were taken to the precinct with the property, advised of their rights, and their identity was learned. . . . And about 20 or 30 minutes elapsed and they were released (Tr. 16).

The story's epilogue is this: around seven o'clock the following morning a Day Care Center in the area reported to police it had been burglarized and its representative identified the items which Detective Jackson had seized from appellant's apartment as having been taken during the burglary. Appellant and his companion were arrested later the same morning.

Thereafter the government proceeded against appellant on a charge of receiving stolen property. Prior to trial the court denied a motion to suppress and appellant then agreed to have the court hear his case without a jury. The government and appellant entered into a stipulation as to the testimony witnesses on each side would present, including testimony that he and his companion had purchased from a stranger the items in question for $50. The court found appellant guilty after hearing testimony concerning the current value of certain of the items seized.

■ The government concedes, and the record requires this concession, that Detective Jackson did not have probable cause to arrest appellant at any time from the mo-

ment of their confrontation on the street until several minutes later when the detective caught up with appellant after he ran from the street into the apartment.[4] On the other hand, as appellant assumes (Br. at 17, n. 8), the presence of appellant and his companion carrying items not usually seen at that hour on the street of a residential neighborhood and their response of flight when the detective identified himself and asked to talk to them supported a reasonable suspicion by the officer that criminal activity was in progress and justified a so-called *Terry* stop of appellant and his companion for brief questioning.[5]

■ The nub of this case, however, is whether the officer was justified, first, in pursuing appellant when he ran rather than stop and answer questions and, second, in carrying that pursuit from the street to the apartment building. *Terry*, in our view, makes clear that an officer who has articulable grounds to suspect a crime is in progress may use force to restrain the individual he suspects in order to maintain the status quo briefly until he can obtain additional information and determine exactly what is occurring. The Court in *Terry* (at 15, 88 S.Ct. at 1877) stated the question posed by that case to be "[w]hether it is always unreasonable for a policeman to *seize* a person . . . unless there is probable cause for an arrest"; and the Court (at 16, 88 S.Ct. at 1877) went on to define a seizure of a person to be "[w]henever a police officer accosts an individual and *restrains* his freedom to walk away"; and, finally, the Court (at 19, n. 16, 88 S.Ct. at 1879) amplified its meaning of restraint as "[w]hen the officer, by means of *physical force* or show of authority, has . . . restrained the liberty of a citizen." (Emphasis added.)

Mr. Justice Harlan's concurring opinion in *Terry* (at 31–34, 88 S.Ct. at 1885) is particularly instructive:

I am constrained to fill in a few gaps, as I see them, in . . . [the] opinion.

\* \* \* \* \* \*

In the first place, if the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a *forcible* stop. . . . [A police officer] must first have a right not to avoid him [a citizen suspect] but to be in his presence. That right must be more than the liberty . . . to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away . . .. I would make it perfectly clear that the right to frisk in this case depends upon the reasonableness of a *forcible* stop to investigate a suspected crime.

\* \* \* \* \* \*

Officer McFadden's right to interrupt Terry's freedom of movement and invade his privacy arose only because circumstances warranted *forcing* an encounter with Terry in an effort to prevent or investigate a crime. Once that *forced* encounter was justified, however, the officer's right to take suitable measures for his own safety followed automatically. (Emphasis added.)

Mr. Justice White's concurrence (at 34, 88 S.Ct. at 1886) also focuses on the right of the officer to use force to stop the suspect for questioning briefly:

There is nothing in the Constitution which prevents a policeman from ad-

---

4. The detective did not see appellant and his companion commit the crime and had no knowledge of any crime having been committed when they saw them carrying the various stereo components and the bag. Appellant's flight is a factor which would legitimately heighten the officers' suspicions that appellant's conduct warranted investigation. *See Smith v. United States*, 295 A.2d 64, 66 (1972). However, given the circumstances of

this case, especially the lateness of the hour and the fact that the officers who stopped appellant were dressed in plain clothes and drove an unmarked car, that flight was not sufficient to give the officers probable cause to believe appellant was engaged in criminal activity.

5. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

dressing questions to anyone on the streets. Absent special circumstances, the person approached may not be detained or frisked but may refuse to cooperate and go on his way. However, *given the proper circumstances,* such as those in this case, it seems to me the person may be briefly *detained against his will* while pertinent questions are directed to him. (Emphasis added.)

■ In the instant case, Detective Jackson was justified under *Terry* in using force to detain appellant on the street briefly for questioning in an effort to determine the situation then unfolding. It follows in our view that when appellant ran from the detective rather than stop to answer his questions, the officer was justified in pursuing appellant in order to detain him forcibly for the purpose of momentary questioning.

■ But there remains the question whether appellant could evade a *Terry* stop for brief questioning on the sidewalk of Savannah Street by running from the officer into the apartment building on that street. We are of opinion that the Supreme Court's recent decision in *United States v. Santana,* — U.S. —, 96 S. Ct. 2406, 49 L.Ed.2d 300 (1976) requires a negative answer to this question. There the Court concluded that a valid arrest "set in motion in a public place" but actually occurring in the arrestee's home must be upheld because: "[A] suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper . . . by the expedient of escaping to a private place." We read the gravamen of the Court's holding in *Santana* to be that when a citizen has knowingly placed himself in a public place *and* valid police action is commenced in that public place, the

citizen cannot thwart that police action by then fleeing into a private place. In the instant case, appellant and his companion were in a public place when Detective Jackson sought to effect a valid *Terry* stop and appellant then tried to thwart that stop by running into the building adjacent to the street and gaining his apartment before the pursuing policeman—six or seven strides behind (Tr. 14)—could catch him.[6] Given these particular circumstances, we conclude the officers here should not have been forced to simply "shrug [their] shoulders and allow a crime to occur or a criminal to escape"; *see Adams v. Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), and that the trial court's decision to deny the suppression motion was correct.

■ We recognize the general rule that police who enter a private dwelling to make an arrest or effect a seizure of contraband without a warrant must have clear-cut probable cause, to arrest or to seize, *see Dorman v. United States,* 140 U. S.App.D.C. 313, 435 F.2d 385 (1970) (en banc), but we view the instant case as presenting quite a different situation requiring the application of a rule of reason. As the government in this case properly emphasizes (Br. at 7):

> His [Detective Jackson] initial desire merely to question the two men was frustrated by their precipitous flight. . . . Detective Jackson's entry into the apartment was an organic part of the unity of action which began when he first called to appellant and ended moments later when the chase ended in appellant's apartment. The entire course of Detective Jackson's actions was . . . a measured and reasonable response to the unfolding situation.

---

6. Appellant points to D.C.Code 1973 § 23–591(b) as supporting his argument that the pursuing officer could not lawfully push open the door being closed in his face by appellant because the officer had *not* made "an announcement of his identity and purpose." The record reflects, as set forth above,

that Detective Jackson had in fact identified himself a minute or two earlier when he had asked to speak to appellant. Assuming arguendo the applicability of the statute to the *Terry* stop situation presented in this case, we conclude there was compliance with the statute.

Once Detective Jackson caught up with appellant, the items that he and the other man had been carrying down the street were in plain view. When appellant refused to respond to his question of to whom the items belonged, the officer then combined this silence, the late-night presence of appellant and his companion on the street carrying a sheet "bagging" other items, his own knowledge about the unique marking on that sheet, and his observation that the equipment in plain view was generally used by public institutions rather than by private individuals, to conclude reasonably that the items had been stolen and the two men before him had possession of these stolen goods.[7] Accordingly, he was justified in seizing the items and transporting appellant to the police precinct.

*Affirmed.*

7. Contrary to appellant's contention, there was evidence sufficient to support the court's finding that the value of the property exceeded $100 and hence we find no merit in his argument that the court should have entered a judgment of acquittal for the government's failure of proof of this aspect of its case.