**Lawrence HARBIN, Plaintiff,**

v.

**CITY OF ALEXANDRIA, a municipal corporation of the State of Virginia, Gary J. Leonard, In his official capacity as Chief of Police, William P. Johnson, In his personal and official capacity as a police officer, and Raymond F. Hazel, In his personal and official capacity as a police officer, Defendants.**

Civ. A. No. 88–1494–A.

United States District Court, E.D. Virginia, Alexandria Division.

April 25, 1989.

Lawrence Harbin, Washington, D.C., pro se.

Philip G. Sunderland, Oliver A. Pollard, III, Office of the City Atty., Alexandria, Va., for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

A stop and frisk incident spawned this action. Plaintiff claims two Alexandria police officers violated his federal and state civil rights when they unlawfully stopped and searched him. In a *pro se* thirteen count complaint against the City of Alexandria, the two police officers and the police chief, plaintiff asserts federal causes of action under 42 U.S.C. § 1983 (Counts I, II, III, X and XI) and 42 U.S.C. § 1985(3) (Count IV). Pendent to these Federal claims, plaintiff alleges state common law and statutory claims for false arrest, invasion of privacy, criminal trespass and conducting an unlawful search (Counts V, VI, VII, VIII and IX) as well as violations of the Virginia Constitution (Counts XII and XIII). Several counts have been dismissed.[1] The only remaining federal claims are Counts I, II and XI. The matter comes before the Court on defendants' motion for summary judgment on the remaining federal claims. Because the dispositive facts are essentially undisputed,[2] summary judgment is appropriate. Rule 56, Fed.R. Civ.P. Accordingly, for the reasons set forth herein, summary judgment as to Counts I, II and XI is granted. The pendent state claims are dismissed without prejudice as this Court declines to exercise its discretionary power to permit them to proceed in federal court. *See United Mine Workers v. Gibb*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

---

1. The Court previously granted defendants' motion to dismiss Count III. *Harbin v. City of Alexandria,* C.A. No. 88–1494–A ¶ 3 (E.D.Va. Mar. 10, 1989) (unpublished order). Counts IV and X were dismissed at plaintiff's request. *Id.* at ¶ 1. Pursuant to a more recent request of plaintiff, the Court also dismisses Counts V, VII and XIII.

2. Most facts have been stipulated to by the parties. Where disputes remain, the Court accepts plaintiff's version for purposes of this motion.

## Facts

At 10:11 p.m. on November 21, 1988, Alexandria Police Officers William P. Johnson and Raymond F. Hazel, defendants in this action, were on patrol in their cruisers when they heard a report from Officer Nick Todaro that he was pursuing a suspect on foot who had been seen brandishing a gun in the vicinity of a 7–Eleven in Alexandria. Officer Todaro next reported that he had turned on to North West Street and was proceeding southbound on that street towards Queen Street in pursuit of the suspect. Officer Todaro reported that he was "[l]ooking for a suspect black male, about 6'3", [wearing] a blue jacket, [and] old cap." Officer Todaro then announced that the suspect was, "[g]oing east on Queen and he's got a gun." The dispatcher at police headquarters told officers in the area to respond to Queen and North West Streets in Alexandria and stated that the subject was armed. Officer Todaro then added that the suspect had brandished a gun at Officer Sydnor and that officers were needed at Queen and Payne Streets. Officer Johnson next reported seeing "a suspect matching that description heading southbound on Henry Street in front of the 7–Eleven." Officer Todaro then reported that he had again spotted the suspect in the park adjacent to Jefferson Houston School on the west side of the 300 block of North West Street. In his next transmission, Officer Todaro reported that the suspect had fled again when he and Officer Sydnor approached, that he was running through the park towards Boyle Street, and that they were pursuing him. Thereafter, Officers Todaro and Sydnor again lost sight of the suspect. All of these sightings occurred within a six block area in Alexandria.

Throughout this time, the dispatcher continued to alert vehicles to be on the lookout for the suspect, "... a black male, 6'3", wearing a blue jacket and blue cap" and stated that the suspect had "brandished a gun." Officer Todaro next reported that he had heard a dog barking behind Jefferson Houston school and that he thought the suspect might be making his way to the Braddock Road Metro Station. This con-clusion was consistent with the suspect's fleeing down Boyle street from the Jefferson Houston school. Officer Johnson then asked Officer Todaro "Did you get a better look at him? Do you have a better description?" Officer Todaro responded:

All I can see was that he has a waist length blue coat on. Looks like it could be a ski parka. He has a wool cap on and it is folded up around the sides. It's a knit cap. That's about all. He was just working his way towards the park.

Shortly after this communication, another police officer reported that he had spotted someone he thought might match the description of the suspect, stating, "[t]his guy's about 6'3", but he's real, real skinny." Officer Todaro responded, "[t]hat's not the suspect, he's real stocky, big build."

At approximately 10:44 p.m., Officer Johnson, in his cruiser, was in the vicinity of the sightings, proceeding east on Oronoco Street, near the intersection of Oronoco and North Peyton Streets. Nearby, Officer Hazel, in his cruiser, was proceeding west on Oronoco Street towards the same intersection. This intersection is located approximately a block and a half north and a block east of the location of Officers Todaro's and Sydnor's last reported observation of the suspect and approximately two and a half blocks south of the Braddock Road Metro Station. As Officers Johnson and Hazel approached the intersection, they both noticed the plaintiff, a black male, 6'4" tall. He was wearing a two-tone gray and black waist-length jacket, brown business suit pants, brown dress shoes, white shirt and a light gray sweater. He was not wearing a cap. Although plaintiff claims a slender frame, the Court having observed plaintiff during argument concludes that plaintiff has neither a slender nor a heavy frame; rather, he has an average, muscular build.

When spotted by Officers Johnson and Hazel, plaintiff was on foot less than three blocks from the location the suspect had last been seen. Officer Johnson turned left on to Colecroft Court to follow the plaintiff and Officer Hazel followed. The

plaintiff continued walking northbound on Colecroft Court towards his home. After walking on Colecroft Court for approximately 150 feet, the plaintiff stepped first onto the sidewalk along the west side of Colecroft Court and then onto the front porch of his home, a townhouse at 508 Colecroft Court. By this time, Officer Johnson was approximately 15 to 20 feet from the plaintiff, while Officer Hazel was approximately 40 feet from the plaintiff and 20 feet behind Officer Johnson. As the plaintiff crossed his threshold and entered his living room, Officer Johnson called out through his open front door and ordered him to stop and stay where he was.[3] As plaintiff turned around, Officer Johnson instructed him to put his hands in the air where they could be seen. Plaintiff did so and moved to the edge of the porch. Plaintiff began moving his hands, attempting to explain who he was. Officer Johnson told plaintiff to keep his hands up. At about this time, Officer Hazel arrived. Both Officers Johnson and Hazel then approached the plaintiff. Although Officer Johnson had his hand on his service revolver, neither officer drew his weapon at any time during the incident.

At this point, plaintiff was standing on the porch of his house and Officer Johnson was standing on the grass area adjacent to plaintiff's house. Next, Officer Johnson noticed a silver object protruding from plaintiff's right jacket pocket. Because he was still concerned about the potential for violence, Officer Johnson reached into plaintiff's pocket and removed a stapler. As he subsequently testified, "I could see that it [the silver object] was not a gun, but still I set it aside because it was still an object, a heavy metal object. A stapler which could have caused harm." (Johnson Deposition at 54). Officer Hazel then walked onto the porch of plaintiff's residence. At this point, plaintiff's wife

emerged from the house and stated, "that is my husband." Officer Hazel then conducted a pat down search of plaintiff and discovered nothing. Officer Johnson then asked the plaintiff for some identification and plaintiff responded by producing a driver's license. After checking the license, Officer Johnson returned it to plaintiff. Then Officer Johnson stated, "Did I see you at 7–Eleven. Oh! It must have been someone else. We are stopping everybody—and are not taking any chances."[4] The officers then returned to their vehicles and plaintiff entered his home. The length of the entire encounter spanned no more than five minutes. At no time did the officers enter plaintiff's home.

### Analysis

**A. Count I**

■ Count I alleges a violation of plaintiff's Fourth Amendment rights. Undisputed record facts demonstrate the contrary. Under the standard in *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968), a police officer may stop a person without an arrest warrant if he has a reasonable, articulable suspicion that the person is engaged in criminal activity. As the Supreme Court later stated in a post—*Terry* decision, so long as "there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information." *Hayes v. Florida,* 470 U.S. 811, 818, 105 S.Ct. 1643, 1648, 84 L.Ed.2d 705 (1985); *see also Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1922–23, 32 L.Ed.2d 612 (1972). It is, moreover, well established that a police officer who has legally stopped a suspect for questioning

---

**3.** The parties dispute the exact language Officer Johnson used in stopping the plaintiff. This dispute is immaterial to resolution of this motion. Worth noting is that there is no contention that the officers used profanity at any time.

**4.** In the submission of stipulated facts, plaintiff has defendant Johnson making the same statement on two different occasions, prior to defen-

dant Hazel's pat down of the plaintiff and at this point. The Court is persuaded that Officer Johnson's statement was made following his request for identification. This corresponds with the facts as plead in plaintiff's complaint. Amended Complaint ¶ 11. In any event, the discrepancy is not material to the analysis.

may conduct a protective frisk or limited pat down search for weapons so long as there is a reasonable, articulable belief that the suspect is armed and dangerous. *Terry*, 392 U.S. at 29, 88 S.Ct. at 1884; *United States v. Cortez*, 449 U.S. 411, 423, 101 S.Ct. 690, 697, 66 L.Ed.2d 621 (1981); *United States v. Moore*, 817 F.2d 1105, 1107–8 (4th Cir.1987); *United States v. Bull*, 565 F.2d 869, 870 (4th Cir.1977).

The facts at bar fall well within *Terry* and its progeny. *Terry* requires officers to have a reasonable, articulable suspicion before stopping a suspect. Here, defendants Johnson and Hazel undeniably had a reasonable, articulable suspicion that plaintiff was the man other officers were pursuing that evening. The suspect police were pursuing was a black male, about 6′3″ tall, with a "stocky, big build," wearing a waist-length blue jacket and wool cap. Plaintiff is 6′4″ tall. That evening he was wearing a waist length gray and black jacket which, at night, could well have been taken to be blue. Moreover, while plaintiff claims to have a slight or slender frame, the Court has in fact observed him to have an average, muscular build. In sum, with the exception of the cap worn by the suspect, plaintiff had most of the physical characteristics of the suspect as broadcast by the police dispatcher. The minor discrepancies between the suspect's reported characteristics and those of the plaintiff are far too slender a reed on which to base a constitutional violation.[5] In addition, plaintiff was within three blocks of the suspect's last observed location. Indeed, plaintiff was located between the last place the suspect had been seen and the Braddock Road Metro Station, the suspect's likely destination. *See Moore*, 817 F.2d at 1106–7 (suspect's location near burglary scene is pertinent to *Terry* analysis). Given the totality of these undisputed record facts, the officers had ample reasonable, articulable suspicion on which to stop and question plaintiff.

The officers' activities after the stop also fall squarely within the parameters of *Terry*. A suspect may be stopped "in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information." *Hayes*, 470 U.S. at 818, 105 S.Ct. at 1648. Essentially, nothing more than this occurred. The entire encounter between the officers and the plaintiff was brief—no more than five minutes. All the officers did was to ask the plaintiff questions concerning his identity, request some form of identification and inquire whether plaintiff had been at the 7–Eleven store. Once plaintiff was positively identified as the owner of the house and the officers ascertained that he had not been at the 7–Eleven store, the *Terry* stop ended. Plaintiff was never moved from the location where the *Terry* stop took place, nor did the officers enter plaintiff's home. They did search plaintiff. But a protective frisk is justified where, as here, there is a reasonable suspicion that the suspect is armed and dangerous. *Terry*, 392 U.S. at 29, 88 S.Ct. at 1884; *Cortez*, 449 U.S. at 423, 101 S.Ct. at 697; *Moore*, 817 F.2d at 1108. Here, the suspect had been reported as "brandish[ing] a gun." It was reasonable for the officers to frisk plaintiff for a weapon. It was also reasonable for Officer Johnson to remove the stapler from plaintiff's pocket; a dangerous suspect might have used the stapler as a weapon.

In sum, the officers' actions were reasonable and lawful in all respects; plaintiff's Fourth Amendment rights were not violated in this incident.

**B.** *Count II*

▮ Count II asserts that the officers' presence on plaintiff's property amounted to an illegal warrantless search. This claim is wholly without merit. The Supreme Court in *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) recognized that a defendant could

---

**5.** A different result would obtain if it were shown that police officers were stopping all black males simply because they were black. Race alone cannot serve as a basis for a reasonable, articulable suspicion. *See United States v.* *Bautista*, 684 F.2d 1286 (9th Cir.1982), *cert. denied* 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 775, 776 (1983); *United States v. Beck*, 602 F.2d 726, 729 (5th Cir.1979).

not thwart an otherwise valid arrest by retreating from the doorway of her home into the vestibule of her house. The *Santana* principle has sensibly been extended to *Terry* stops. In *Edwards v. United States*, 364 A.2d 1209 (D.C.1977), an officer attempting to complete a lawful *Terry* stop pursued suspects into an apartment after the door had started to close. The officer pushed the apartment door open before it closed completely. He then questioned the suspects inside the apartment. Relying on *Santana*, the *Edwards* court held that the officer had effected a proper *Terry* stop within the apartment. *See also United States v. Gomez*, 495 F.Supp. 992, 1005 (S.D.N.Y.1979) ("agents [who] continued pursuit of the suspects after they retreated and slammed the door did not contravene the Fourth Amendment;" a valid *Terry* stop occurred within); *Servis v. Commonwealth*, 6 Va.App. 507, 371 S.E.2d 156, 160–63 (1988) (officers who believe suspect to be potentially dangerous may follow suspect into his home to conduct a protective sweep). Here, plaintiff was "stopped" by Officer Johnson's call immediately after crossing from the porch of his house through the front door into his living room. Unlike *Edwards*, there was no attempt by plaintiff to close the door. Rather, the door remained open behind him. This Court, therefore, is not called upon to determine whether an attempt by plaintiff to close his door would preclude a valid *Terry* stop. Instead, the Court decides only that the Fourth Amendment does not command that officers cease attempts to effect an otherwise valid *Terry* stop merely because a suspect crosses from the porch of his house to the living room through a still open door.

Plaintiff also argues that Officers Johnson and Hazel violated the Fourth Amendment by unlawfully entering onto the front porch of his home. (Amended Complaint ¶ 20). This claim equally is without merit. In *Santana*, the defendant originally argued that she had a legitimate expectation of privacy in the doorway of her house. The *Supreme Court* replied,

[w]hile it may be true that under the common law of property the threshold of one's dwelling is "private," as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a "public" place. She was not in an area where she had any expectation of privacy. "What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection.

*Santana*, 427 U.S. at 42, 96 S.Ct. at 2409 [quoting *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967)]. Plaintiff's front porch—like the doorway of a house or a yard—is "knowingly expose[d] to the public." *Id.* Therefore, it, too, "is not a subject of Fourth Amendment protection." *Id.* Put differently, the Fourth Amendment does not preclude Officers Johnson and Hazel from standing on plaintiff's front porch to effect a *Terry* stop.

### C. *Qualified Immunity*

■ Even if the Officers' actions violated plaintiff's constitutional rights, the officers nonetheless would be entitled to immunity from prosecution on Counts I and II. The doctrine of qualified immunity shields them. *See Barts v. Joyner*, 865 F.2d 1187 (11th Cir.1989) (qualified immunity applied to *Terry* stop situation); *see also Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Osabutey v. Welch*, 857 F.2d 220 (4th Cir.1988); *Tarantino v. Baker*, 825 F.2d 772 (4th Cir.1987). The doctrine's applicability is determined by an objective standard. As the Fourth Circuit put it, "the test of qualified immunity for executive officers is one of 'objective legal reasonableness'—whether an official acting under the circumstances at issue reasonably could have believed that his action did not violate the constitutional rights asserted." *Sevigny v. Dicksey*, 846 F.2d 953, 956 (4th Cir.1988) [quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)]. The *Sevigny* court applied this standard to warrantless arrests and concluded that "the test is whether a police officer acting under the circumstanc-

es at issue reasonably could have believed that he had probable cause to arrest, i.e., to believe that the arrestee was committing or had committed a criminal offense." *Sevigny*, 846 F.2d at 956. Even if the officer did not have probable cause to make the arrest, "he might still be entitled to immunity if, on an objective assessment of the circumstances, an officer situated as was he reasonably could have believed that there was probable cause to arrest. . . ." *Id.; see also Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3038–40, 97 L.Ed.2d 523 (1987); *Hansen v. Meese*, 675 F.Supp. 1482, 1485–86 (E.D.Va.1987).

The qualified immunity standard in *Sevigny* is plainly applicable to a *Terry* stop situation. Even if the officers had no basis for a *Terry* stop, they "might still be entitled to immunity if, on an objective assessment of the circumstances, an officer situated as [were they] reasonably could have believed that there was . . . cause" to stop the plaintiff. *Sevigny*, 846 F.2d at 956. In the case at bar, a reasonable officer, under the circumstances faced by Officers Johnson and Hazel, could have concluded that there were "articulable facts supporting a reasonable suspicion that a person had committed a criminal offense. . . ." *Hayes v. Florida*, 470 U.S. 811, 818, 105 S.Ct. 1643, 1648, 84 L.Ed.2d 705 (1985). After all, in most respects the plaintiff matched the suspect being pursued. Moreover, plaintiff was within three blocks of where the suspect had last been sighted and this location was consistent with the direction in which the police believed the suspect to be heading. These undisputed facts were such as to provide *any* reasonable officer with an articulable suspicion to stop the plaintiff. Accordingly, Officers Johnson and Hazel are entitled to qualified immunity even assuming their actions violated plaintiff's federal constitutional rights.

6. Plaintiff argues that summary judgment as to Count XI is inappropriate because discovery is not yet complete. Plaintiff normally would be entitled to demonstrate, following discovery, that Alexandria acquiesced in an improper custom among police officers of illegal searches and seizures. *Spell*, 824 F.2d at 1390–91. But

### D. *Count XI*

■ Summary judgment also claims Count XI. This Count, solely against the City of Alexandria, asserts that the city maintains a custom or policy of conducting illegal searches and seizures. Under the standard set forth in *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658, 698, 98 S.Ct. 2018, 2040, 56 L.Ed.2d 611 (1978), municipalities are only liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or act may fairly be said to represent official policy, *inflicts the injury.*" *Id.* (emphasis added); *see also City of St. Louis v. Praprotnick*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Therefore, a necessary prerequisite for finding the City liable is a violation of plaintiff's constitutional rights by the defendant officers. *See City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (where no constitutional violation occurred, city could not be held liable for unconstitutional policy); *Giancola v. State of West Virginia Dep't of Public Safety*, 830 F.2d 547, 550 (4th Cir.1987); *see also Spell v. McDaniel*, 824 F.2d 1380, 1387–88 (4th Cir.1987) (to hold municipality liable, plaintiff must establish causal link between municipal policy and specific constitutional violation). This requirement is not met in the case at bar— Officers Johnson and Hazel simply did not violate any of plaintiff's constitutional rights. The City, therefore, is entitled to summary judgment on Count XI.[6]

### *Conclusion*

The Court declines to exercise its discretion to hear the state claims because they may well raise novel state issues more ap-

in this case, plaintiff's constitutional rights were not violated. As this necessary precondition to recovery has not been met, further discovery is unnecessary. The Court need not consider past acts of Alexandria police officers to hold, in this case, that the City is entitled to summary judgment.

propriately resolved in state courts.[7]

---

7. Still remaining to be considered by the state court is whether state law sovereign immunity applies to violations of Virginia's statutes or constitution. Moreover, there is a question of first impression still to be resolved: Does a cause of action exists based solely on the Virgi-

nia Constitution? Such a cause of action would be analogous to a *Bivens*-type cause of action under the United States Constitution. *See Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).