THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MANUEL RIVERA, Defendant-Appellant.
Second District   No. 2—91—0627

Opinion filed August 14, 1992.

Stephen C. Wilson, of Wilson, Camic & Colton, Ltd., of Aurora, for appellant.

Gary V. Johnson, State's Attorney, of Geneva, and Basil G. Greanias, of Decatur (William L. Browers and John X. Breslin, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DOYLE delivered the opinion of the court:

Following a stipulated bench trial, defendant, Manuel Rivera, was convicted of the offense of the unlawful possession of 2.2 grams of a substance containing cocaine (Ill. Rev. Stat. 1989, ch. 56½, par. 1402(b)). The trial court sentenced defendant to a two-year term of probation and a $200 fine. Defendant appeals the trial court's denial of his motion to quash his arrest and suppress the evidence, and he raises the following issues: (1) whether the entry of the police officers into the basement of defendant's business was illegal; (2) whether defendant was arrested illegally when he was detained by the police; (3) whether defendant's consent to the search of his person was involuntary; and (4) whether defendant was denied a fair hearing when the trial court considered matters outside the record in assessing the credibility of one of the testifying police officers.

Officer Renaud testified at the hearing on defendant's motion to suppress evidence that on the evening of February 20, 1990, he and Detective Reichardt of the Aurora police department were conducting "routine tavern checks." They were in plain clothes when they entered defendant's bar, La Tropicana. The officers had information developed by the police that cocaine was stored in the basement of La Tropicana and that defendant was involved in the sale and distribution of cocaine. The officers did not have a warrant to search the premises or to arrest anyone there. La Tropicana was open, and there were a number of patrons at the bar.

Defendant testified through an interpreter. According to defendant's version of the events of February 20, 1990, he was in the basement of the bar when the police arrived. The officers identified themselves as police officers and told defendant to put his hands up. Defendant denied that he gave the officers permission to search his person. Defendant testified that the basement was a private area and there was a sign on the premises indicating that the basement was private. The band was warming up in the basement prior to its performance, and Tom Wilkinson was also in the basement when the police arrived.

In contrast, Officer Renaud testified that defendant was standing at the end of the bar when the officers entered. According to

Renaud, defendant looked at him when Renaud was five or six feet from him, ran four or five feet to the basement door, opened it and ran down the stairs. Renaud did not recall seeing a "private" sign next to the basement door. He had not had any prior encounters with defendant, and only knew what defendant looked like because he had seen a photograph of defendant.

The officers pursued defendant through the open door and down the stairs. Defendant ran to an office in the basement, pushed the door open, and yelled "police." Renaud rushed into the office, and Wilkinson was leaning over a card table in the office. When Wilkinson saw the officers, he stuffed a "big bag" into his mouth. Wilkinson would not spit out the bag and denied that he swallowed anything. After two uniformed back-up officers arrived, Renaud twice asked defendant if the officers could search him. According to Renaud and Officer Strom, defendant twice agreed. Renaud spoke to defendant in English, and defendant answered in English. The officers found a small packet of cocaine in defendant's pocket.

Renaud testified that his reason for following defendant downstairs was not a fear for his own safety. Renaud "was startled when [defendant] turned suddenly and ran. [Renaud] thought something was up." During questioning by the court, Renaud explained that defendant's personality changed when he looked at Renaud and that he appeared frightened because Renaud was in the bar. Renaud believed defendant ran because he was violating a narcotic law by being in possession of a drug. Renaud, who had been a police officer for 18 years, testified that he believed the defendant "was frightened because I was there, and to me, what I represented in that tavern, from going in there so many times, was a narcotics officer, not a patron, I wasn't there to buy a drink."

Following arguments by counsel, the court explained its reasoning. The court stated in relevant part:

"I don't see that the officer had a real basis to follow [defendant] down the stairs, but the door being opened, he has no problem, he can follow him down the stairs.

When he gets down to the bottom of the stairs, then it becomes an issue of what he can do once he gets down there, because right now we don't know [defendant]'s doing anything wrong. It's strictly speculation, guess, and conjecture.

He can be running down to tell the guys [']cut out a card game.['] *** [W]e don't know why he's running.
***

\*\*\* At this point I don't think there's a basis to search the defendant.

However, at this point Officer Renaud, that [sic] I've seen testify many, many, many times in this court, testifies under oath that he asked [defendant] not once, but twice, can I search you.

Sounds strange to me some defendant would say okay when he has some stuff on him. But Officer Renaud said yes, he not only did it once, but he drew the attention of the other officers to what was going to be said, and he asked [defendant] a second time, and [defendant] said yes."

The court concluded that defendant consented voluntarily to the search of his person. Defendant raised the suppression issues in a motion for a new trial, which the court denied.

The defendant bears the burden of proof on a motion to suppress evidence. (Ill. Rev. Stat. 1989, ch. 38, par. 114—12; *People v. Janis* (1990), 139 Ill. 2d 300, 308.) A trial court's denial of a motion to suppress evidence should not be disturbed unless it is contrary to the manifest weight of the evidence. *Janis*, 139 Ill. 2d at 308.

Both the Federal Constitution and our State Constitution prohibit unreasonable searches and seizures. (U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6.) This protection applies to commercial premises as well as private homes. (*New York v. Burger* (1987), 482 U.S. 691, 699, 96 L. Ed. 2d 601, 612, 107 S. Ct. 2636, 2642; *Janis*, 139 Ill. 2d at 309.) Although commercial premises do not enjoy the same degree of privacy as a residence (*Burger*, 482 U.S. at 700, 96 L. Ed. 2d at 612, 107 S. Ct. at 2642), the determination of whether commercial premises, or some part thereof, are entitled to protection depends on the owner or occupier's subjective expectation of privacy in the premises (*Janis*, 139 Ill. 2d at 313-14). The analysis turns upon whether the area entered by the police is open to the public, since "[a] warrant is necessary only to search those areas of commercial premises from which the public has been excluded." (139 Ill. 2d at 317.) The entry into a private area is considered a "search." 139 Ill. 2d at 313.

Notwithstanding the warrant requirement enunciated in *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, the Supreme Court has held that a suspect may not defeat an arrest which was set in motion in a public place by escaping to a private place. (*United States v. Santana* (1976), 427 U.S. 38, 43, 49 L. Ed. 2d 300, 306, 96 S. Ct. 2406, 2410.) In *Santana*, the police had probable cause to arrest an individual and drove to her house

to do so. Upon arriving there, the police observed the person standing directly in the doorway of the house. (*Santana*, 427 U.S. at 40 n.1, 49 L. Ed. 2d at 304 n.1, 96 S. Ct. at 2408 n.1.) The police identified themselves, and as they approached, Santana retreated into her house. The officers followed her in, catching her in the vestibule. *Santana*, 427 U.S. at 40, 49 L. Ed. 2d at 304, 96 S. Ct. at 2408.

The Court determined that Santana was in a public place as she stood in the doorway and was subject to a warrantless arrest at that point. More importantly, the Court concluded that the police were not required to refrain from entering the home and arresting her without a warrant. The Court pointed out that "hot pursuit," which justified the warrantless entry in that case, meant "some sort of a chase" but did not require an extended pursuit through the public streets. *Santana*, 427 U.S. at 43, 49 L. Ed. 2d at 305, 96 S. Ct. at 2410.

We recognize that *Santana* addresses the question of whether a suspect may thwart police efforts in effectuating a warrantless arrest in a public place by hastening to a private place which would otherwise be protected against a search without a warrant. Thus, *Santana* does not directly resolve the precise issue in this case, and we find no Illinois case which directly addresses the question of whether a suspect may, by entering a private location, prevent the police from conducting a *Terry* stop. We find guidance, however, in decisions from other jurisdictions that have addressed this question.

In *Edwards v. United States* (D.C. App. 1976), 364 A.2d 1209, the police had reasonable suspicion to stop two suspects on a public street. When an officer rolled down his window and advised the suspects of his police status and that he wanted to talk to them, they "took off running." (*Edwards*, 364 A.2d at 1211.) The suspects ran up a flight of stairs and entered an apartment. The officer, who was directly behind them, followed the suspects in, seized certain property they were carrying and transported them to the station. They were later released without being arrested. *Edwards*, 364 A.2d at 1212.

Relying on *Santana*, the *Edwards* court concluded that it was reasonable for the police to have pursued the suspects into the apartment to effectuate the intended *Terry* stop that the officers originally initiated on the street. (*Edwards*, 364 A.2d at 1214.) In so holding, the court interpreted the essence of *Santana* to be that, when a suspect is in a public place and valid police action is commenced therein, the suspect cannot thwart that police action by

fleeing into a private place. (*Edwards*, 364 A.2d at 1214.) While we recognize that upon an *en banc* rehearing the police conduct in *Edwards* was upheld on the ground that the police had probable cause to arrest (see *Edwards v. United States* (D.C. App. 1977), 379 A.2d 976), we are persuaded by the analysis in the original opinion which does not appear to have been expressly repudiated on rehearing. See 3 W. LaFave, *Search & Seizure* §9.2(d), at 369 (1987) (commenting upon the logic of the original *Edwards* opinion).

In *United States v. Pace* (7th Cir. 1990), 898 F.2d 1218, the police had reasonable suspicion that defendant was involved in an effort to assassinate a reputed mob figure. The police were trailing defendant while he drove the mobster's car. As he drove into a condominium complex, the defendant apparently spotted the officers, sped up and made several turns. (*Pace*, 898 F.2d at 1224.) The officers considered the defendant's driving maneuvers to be an attempt to elude them. The defendant opened an electronic garage door and entered the garage. One of the officers followed in his car and stopped the defendant.

Assuming that the garage was part of the curtilage of the condominium, the court concluded that the police did not violate the fourth amendment by entering the garage to detain the defendant. (*Pace*, 898 F.2d at 1228-29.) Noting that the touchstone of a *Terry* stop is the general reasonableness requirement of the fourth amendment, the court concluded that the entry into the garage, under the circumstances, was reasonable. In so holding, the court balanced the need of the police to investigate a threat to the mobster's life against the brief detention of the defendant to allay the police suspicions. *Pace*, 898 F.2d at 1229.

Within the context of a civil rights action filed by a *Terry* stop detainee, a United States District Court has ruled upon the issue of officers effecting a detention after the detainee had entered his home. In *Harbin v. City of Alexandria* (E.D. Va. 1989), 712 F. Supp. 67, officers were following a pedestrian suspected of carrying a firearm. When the suspect stepped onto the front porch of his home the officers were 20 to 40 feet behind him. As the suspect crossed his threshold and entered his living room, one of the officers called through the open front door and ordered him to stop. The suspect turned around and put his hands in the air and then returned to the porch, where he was frisked. Citing *Santana* and the original *Edwards* opinion, the district court held that the stop occurred when the officer called out to the suspect through the open door and the suspect turned around. (*Harbin*, 712 F. Supp. at 71-

72.) The court concluded that the fourth amendment does not require that officers cease efforts to effect an otherwise valid *Terry* stop merely because a suspect attempts to thwart their efforts by running into his dwelling. *Harbin*, 712 F. Supp. at 72.

◼◼ Our review of the foregoing authorities leads us to conclude that the police, in certain limited circumstances, may be authorized to make a warrantless entry into a private premises for the purpose of effectuating a *Terry* stop provided the police have a lawful basis to stop a suspect in a public place and the suspect reacts by suddenly fleeing to a private sanctuary, thereby thwarting any opportunity to conduct the detention at a public location.

Such a warrantless entry must be premised, of course, upon a reasonable suspicion to stop the defendant. In *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, the Supreme Court recognized a limited exception to the probable cause requirement which allows a police officer under appropriate circumstances, and in an appropriate manner, to effect a brief detention of a person for investigation purposes, and, if necessary for safety, to conduct a limited protective search of that person for concealed weapons. Specific and articulable facts, and not a mere hunch, must exist to justify a *Terry* stop and frisk for a weapon. (*Terry*, 392 U.S. at 27, 20 L. Ed. 2d at 909, 88 S. Ct. at 1883.) These principles have been codified in our Code of Criminal Procedure of 1963. (See Ill. Rev. Stat. 1989, ch. 38, par. 107—14; *People v. Long* (1983), 99 Ill. 2d 219, 228.) Section 107—14 provides that a peace officer "may stop any person in a public place *** when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense." (Ill. Rev. Stat. 1989, ch. 38, par. 107—14.) Thus, under the circumstances of the present case, we must determine whether the police officers had developed reasonable suspicion to stop defendant while he was in a public place.

◼ As a threshold matter, it is noted that the police officers were in a tavern apparently open to the public. Officer Renaud testified that the tavern was open and there were a number of patrons at the bar. Defendant does not suggest otherwise, and we necessarily conclude that the tavern was a public place.

Officer Renaud testified that he and Detective Reichardt were in plain clothes when they entered defendant's tavern. Although Renaud had not previously seen defendant, he had gone into defendant's tavern many times in the capacity of a narcotics officer. The officers had information developed by the police that cocaine was stored in the basement and that defendant was involved in co-

caine trafficking. According to Renaud, defendant was standing at the bar when they entered. When Renaud was five or six feet from defendant, defendant looked at him, ran four or five feet to the basement door, opened it and ran down the stairs. According to Renaud, defendant's personality changed upon his looking at Renaud, and defendant appeared frightened because of Renaud's presence. When defendant reached the basement office area he yelled "police." Although defendant testified to a different version, it is apparent from the trial court's ruling that it accepted Renaud's description of the events. There appears to be no basis to reject Renaud's testimony as clearly unreasonable, and, therefore, we need only determine whether, as a matter of law, his testimony satisfies the requirements for a valid *Terry* stop. See *People v. Clark* (1982), 92 Ill. 2d 96, 99.

We conclude under the circumstances Renaud had a reasonable basis to stop defendant for investigatory purposes. Sudden flight from the police may, under the appropriate circumstances, provide reasonable suspicion to stop the fleeing individual pursuant to *Terry*. (See *People v. Holdman* (1978), 73 Ill. 2d 213, 221; *Village of Gurnee v. Gross* (1988), 174 Ill. App. 3d 66, 70-71; *People v. Tribett* (1981), 98 Ill. App. 3d 663, 672; *People v. Montgomery* (1977), 53 Ill. App. 3d 298, 302.) Moreover, the Supreme Court has stated that "deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea*." (*Sibron v. New York* (1968), 392 U.S. 40, 66, 20 L. Ed. 2d 917, 937, 88 S. Ct. 1889, 1904.) Here, defendant looked at Renaud and ran four or five feet to a basement door. This, combined with the information known to the officers before entering the tavern, provided Renaud the reasonable suspicion necessary to stop defendant to investigate his conduct in running to the door at the approach of the officers.

In reaching this conclusion we have focused only upon those facts apparent to Renaud *prior* to defendant entering the stairs leading to the basement. It is unnecessary to reach the issue of whether defendant's conduct in entering the basement stairs or his actions after entering could reasonably be relied upon by Renaud as a basis for stopping defendant.

■ The next question is whether it was reasonable, in light of the principle discussed earlier, for Renaud to follow defendant into the basement area to effectuate the stop. As discussed, Renaud had the requisite reasonable suspicion to stop defendant as he ran to the basement door. Such a stop was rendered virtually impossible, however, because defendant was only four or five feet from the

door and Renaud was five or six feet from defendant. Defendant's apparent flight threatened to defeat any effort by Renaud to stop him for investigatory purposes.

Furthermore, defendant was suspected of dealing cocaine, was present in a place where cocaine was believed to be located, and was running to a doorway as a police officer approached. These peculiar circumstances are compelling reasons tending to justify immediate pursuit by the police. Law enforcement officers face a potentially dangerous and volatile situation when they confront suspected drug traffickers. (*Cf. People v. Condon* (1990), 195 Ill. App. 3d 815, 823-24, *aff'd* (1992), 148 Ill. 2d 96 (officers who execute warrants on suspected drug dealers face potentially dangerous and volatile situations).) Such a situation as that present in this case called for immediate action by Renaud to ascertain the intent and purpose of defendant in running to a door upon the approach of the police.

Additionally, it is significant to note the relative continuity of defendant's response to the police presence and the corresponding reaction of Renaud to defendant's flight. Renaud's entry into the stairwell and basement was an integral part of a course of action initiated by Renaud's approaching defendant, continued by defendant's flight and Renaud's chase, and ended with the detention of defendant in the basement office. The entire course of Renaud's actions, including his immediate pursuit of defendant into the basement area, was a reasonable response to the rapidly unfolding situation.

Viewing in their totality the unique circumstances of this case, we conclude that Officer Renaud's actions in pursuing defendant into the stairwell and basement and detaining him in the office for investigatory purposes was a reasonable intrusion which did not offend the fourth amendment. In our view, *Terry* must be read as giving a police officer not only the right to stop a suspect under carefully defined circumstances but also the power reasonably necessary to implement that right.

■ Defendant's next contention is that his consent to search was not voluntary because it was the product of the unlawful entry into the basement and seizure of his person. Defendant's initial argument on this point must be rejected in view of our determination that he was not unlawfully detained in the basement office. Furthermore, while defendant suggests, without citation of authority, that a "seizure tantamount to an arrest occurred," he has offered no argument as to why Renaud's actions in seizing him in the base-

ment rose to the level of an arrest. Points not argued and supported by citation of authority are waived. 134 Ill. 2d R. 341(e)(7).

Defendant makes the further argument, however, that his consent was involuntary notwithstanding the legality of the police conduct in entering the basement and seizing him because they pursued him into the basement and compelled him to raise his hands and because he spoke broken English. A trial court's determination of the voluntariness of a consent will not be disturbed on review unless it is clearly unreasonable. (*People v. Casazza* (1991), 144 Ill. 2d 414, 417-18.) Whether a consent is voluntary depends on the totality of the circumstances. (*Casazza*, 144 Ill. 2d at 417.) Consent is given voluntarily when it is not the product of implied or actual coercion or duress, it is specific and unequivocal and it is given freely and intelligently. *People v. Purchase* (1991), 214 Ill. App. 3d 152, 155.

Here, defendant asserts that his consent was the product of duress. He does not urge any other basis for his claim that his consent was involuntary. The fact that the police chased defendant and compelled him to raise his hands is insufficient to demonstrate that the trial court reached a clearly unreasonable conclusion that the consent was voluntary and not the product of duress. The additional fact that defendant spoke broken English, a fact more relevant to the question of whether the consent was knowing, does not compel a different conclusion.

Defendant's final contention is that he was denied a fair hearing because the trial judge considered matters outside the record in assessing the arresting officer's credibility. Specifically, defendant argues that the trial judge's comment that he had seen Officer Renaud "testify many, many, many times in this court" demonstrates his improper consideration of information outside the record on the issue of Renaud's credibility in this case.

█ In a bench trial it is presumed that the judge has considered only competent evidence, and such presumption may only be rebutted where the record affirmatively demonstrates the contrary. (*People v. Gilbert* (1977), 68 Ill. 2d 252, 258-59; see *People v. Buchanan* (1991), 211 Ill. App. 3d 305, 322.) Here, the record does not affirmatively demonstrate that the trial court considered a matter outside the record as bearing on Renaud's credibility. The record merely indicates that the trial judge commented that he had seen Officer Renaud testify in the past. The record is silent as to what significance, if any, the court gave to Renaud's past testimony or whether the trial court even considered it in assessing credibility.

80

Implicit in defendant's argument is the suggestion that the court considered Renaud to be credible in this case based on his prior testimony. Considering the ambiguity of the trial court's comment, it is also possible that it considered Renaud to have been less credible in this case based upon a dubious record of past performance as a witness. The record fails to demonstrate the court's consideration of matters outside the record which would be sufficient to rebut the presumption of judicial propriety.

For the foregoing reasons, we affirm the judgment of the circuit court of Kane County.

Affirmed.

INGLIS, P.J., and DUNN, J., concur.