858 F.2d 800
 UNITED STATES of America, Appellee,
v.
Jorge E. RENGIFO, a/k/a Jorge Castro, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Aldemar OREJUELA, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Miller GONZALEZ, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Victor GONZALEZ, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
SIGIFREDO L. GONZALEZ, a/k/a Roderigo Gonzalez, Defendant, Appellant.
 Nos. 87-2043 to 87-2047.
 United States Court of Appeals,
First Circuit.
 Heard July 27, 1988.
Decided Oct. 6, 1988.
Rehearing and Rehearing En Banc Denied in No. 87-2044 Nov. 28, 1988.
 
 Charles J. Rogers, Jr., Providence, R.I., by Appointment of the Court, for appellant Jorge E. Rengifo.
 Anthony V. Lombardino, Kew Gardens, N.Y., with whom David L. Lewis and Lewis & Fiore, New York City, were on brief for appellant Aldemar Orejuela.
 Robert M. Simels with whom Charles L. Weintraub, New York City, was on brief for appellant Miller Gonzalez.
 Albert B. West, Providence, R.I., by Appointment of the Court, for appellant Victor Gonzalez.
 Richard D. Glovsky, by Appointment of the Court, with whom Law Offices of Richard D. Glovsky and Maryann Cash, Boston, Mass., were on brief for appellant Sigifredo L. Gonzalez.
 Kenneth P. Madden, Assistant United States Attorney, with whom Lincoln C. Almond, United States Attorney, Providence, R.I., was on briefs for appellee.
 Before BOWNES, TORRUELLA and NOONAN,* Circuit Judges.
 TORRUELLA, Circuit Judge.
 
 
 1
 Six codefendants, all Colombian nationals, were tried on four counts of importing and possessing with intent to distribute more than five kilograms of cocaine, and conspiring to do the same.[1] One defendant was acquitted and five were convicted on all counts. The convicted, Aldemar Orejuela (Orejuela), Jorge Rengifo Castro (Rengifo), Miller Gonzalez Lenis (Miller), Victor Gonzalez Lenis (Victor), and Sigifredo Gonzalez Lenis (Sigifredo),[2] claim that the district court erroneously failed to suppress evidence on various grounds and that the evidence against them was insufficient to support the findings of guilt. We disagree and affirm.
 
 
 2
 * Because appellants' claims are focused primarily on whether there was sufficient evidence not only to convict, but even to arrest, several of the defendants, we first present a rather detailed summary of the facts in this case. These facts are those presented mostly in testimony by government agents and which, when viewed in the light most favorable to the government, could reasonably have been accepted by the jury. See United States v. Molinares Charris, 822 F.2d 1213, 1218 (1st Cir.1987).
 
 
 3
 On April 11, 1987 at approximately 8:30 AM a Panamanian flagged vessel, the Margranel, arrived in Providence, Rhode Island, direct from Colombia. Since government agents had received a tip that the ship likely was carrying cocaine, a drug seized from the ship on six previous occasions, they immediately put the vessel under surveillance.
 
 
 4
 Only one-half hour after the ship's arrival, a local police officer saw two people on the waterfront across from the Margranel. Shortly thereafter, an automobile, later determined to be leased to Victor, drove from near where the two individuals were observed to a second location across from the Margranel. Agents saw the vehicle's two occupants looking toward the ship. Later that evening, Victor's automobile again was observed in the port area.
 
 
 5
 The following morning government agents observed a second vehicle, owned by appellant Orejuela, near the Margranel. The vehicle's two occupants, one of them Orejuela, got out of the automobile to look at the Margranel. Shortly after they left the dock in Orejuela's car, he again was seen near the ship, this time alone.
 
 
 6
 During that afternoon, Orejuela's automobile, with three occupants, was observed by government agents as it circled, before exiting, the parking lots of Howard Johnson Inn and the Susse Chalet in the nearby town of Warwick, Rhode Island. Several hours later, Victor, Orejuela, and Miller drove to the Howard Johnson Inn in Orejuela's car. Just after midnight, the same vehicle left the motel with two occupants, drove to the port area, and returned. An agent then saw Miller and Orejuela in the motel corridor near room 106.
 
 
 7
 About forty-five minutes later, at approximately 2:00 AM on April 13, government agents stationed at the dock observed two darkly dressed individuals move toward the bow of the Margranel. They were met by a crewman from the ship who gave them two duffel bags in exchange for a large white plastic bag. The two suspects, one identified as appellant Sigifredo, then ran into the tank farm area of the dock. A government agent pursued them and subsequently found Sigifredo and Rengifo lying on their stomachs, crawling down an incline toward an opening in a fence, approximately 100 yards from the Margranel. Six feet from Rengifo were two duffel bags containing over fifty-five kilograms of cocaine. Agents later recovered from the Margranel a white plastic bag containing $89,610.
 
 
 8
 Shortly after the arrests of Sigifredo and Rengifo, government agents checked the guest register of the Howard Johnson Inn and found that room 106 was registered for a party of two to a "Gonzalez," the same name as one of those arrested at the dock. An agent then placed a telephone call to that room after stationing other agents at both its doors. According to his testimony, the agent stated in Spanish to the person who answered the call "that there had been problems at the vessel. That people had been arrested and that it would be best that they leave the room and the area." Apparently the only response the agent received was, "What happened?" Within ten seconds, the door to room 106 opened from within, and Miller, fully dressed and carrying a duffel bag, started through the door. Victor was close behind him, but Orejuela was still on the bed. Agents entered the room and placed the three under arrest.
 
 
 9
 After the agents handcuffed the suspects, one officer seized a key lying on top of the room's television. The agents then searched the suspects. On Victor they found a rental receipt for the automobile observed near the dock on the day the Margranel arrived, and identification showing he was a resident of Flushing, New York. From Miller they seized two pieces of paper listing combinations of letters in the form of what appeared to be code names, each combination followed by a number. Fifteen of the letter combinations on the papers matched those found on the packages of cocaine in the duffel bags seized at the dock. An agent testified at trial that, in his judgment, the lists identified the various individuals who were to receive specified cocaine packages. Finally, from Orejuela, they seized the key to room 106, the room they were in, and identification also showing a New York address. A government agent testified that, after Victor heard his Miranda warnings, Victor stated that "[t]he keys that were shown to him [apparently referring to the key taken from the top of the television] belonged to a room in another--the other hotel. That was his [Victor's] room."
 
 
 10
 Agents next checked with the night clerk at the Susse Chalet and determined that the key found on top of the television belonged to room 204 of that motel, and that the room was registered for two to Sigifredo Gonzalez. The agents entered that room and briefly searched it to see if anyone was hiding inside. Nothing was found or taken at that time.
 
 
 11
 The government then secured warrants to search room 106 of the Howard Johnson Inn, room 204 of the Susse Chalet, and Orejuela's automobile. In room 204, agents found two pieces of paper, one with a telephone number and "106" written on it, and the other with a sketch of the dock area and the Margranel. The telephone number was partially illegible but similar to that for Howard Johnson Inn. They also seized wallets containing identification cards belonging to Sigifredo and Rengifo.
 
 II
 
 12
 Appellants first complain that the government agents knew that their early morning telephone call to room 106, warning the occupants that "it would be best that they leave the room and the area" because there had been a problem at the vessel, would cause the occupants to flee the room. They argue that the telephone call therefore was an attempt to evade the requirement for an arrest warrant by artificially creating an exigent circumstance. We agree with the government, however, that the call instead was a creative investigative effort and simply an example of good police work.
 
 
 13
 We recognize, of course, that "exigent circumstances" do not excuse the failure to secure a warrant when those circumstances are created by government officials who unreasonably and deliberately delay or avoid obtaining the warrant. See, e.g., United States v. Collazo, 732 F.2d 1200, 1204 (4th Cir.1984), cert. denied, 469 U.S. 1105, 105 S.Ct. 777, 83 L.Ed.2d 773 (1985); United States v. Curran, 498 F.2d 30, 34 (9th Cir.1974); Niro v. United States, 388 F.2d 535, 540 (1st Cir.1968). Government agents cannot "delay" or "avoid" obtaining a warrant, however, if there is no probable cause for obtaining one. An agent does not avoid or delay applying for a warrant if he or she is conducting an investigation spurred by suspicion, but without, in her reasonable judgment, sufficient evidence to establish probable cause to support a warrant. See United States v. Ferrara, 539 F.2d 799, 802-03 (1st Cir.1976).
 
 
 14
 In this case, all parties agree that prior to the telephone call at issue the government did not have probable cause to arrest the occupants of room 106. Until the call was made, then, the government could not obtain a warrant. Therefore, since the agents could not have obtained a warrant if they tried, they could not possibly have telephoned room 106 in order to avoid the requirement of an arrest warrant. It was not at least until the agents witnessed the reaction of the room occupants to the telephone call that they believed that they had probable cause to arrest the occupants. If the occupants' attempt to flee created an exigent circumstance at the same moment, there was then no time to secure a warrant. Therefore, since the agents did not have probable cause at least until the same event that created what they believed to be exigent circumstances, they did not improperly delay obtaining an arrest warrant.
 
 III
 
 15
 The arrests, of course, would still be invalid if the agents were not justified in their belief that the suspects' reaction to the telephone call created probable cause. This is the gist of the appellants' next challenge.
 
 
 16
 The Supreme Court has stated the test for probable cause as "whether at [the moment the arrest was made] the facts and circumstances within [the authorities'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). While perhaps a close case, we believe this test was satisfied at the time of the arrests.
 
 
 17
 Admittedly, prior to the telephone call, the government agents knew only that they had observed as yet unidentified persons acting somewhat suspiciously in the parking lot of the motel and, on several occasions, in the vicinity of a boat which contained narcotics. They had also seen one of the suspects near room 106 of the motel, a room registered under the same, but very common, Hispanic surname--Gonzalez--as used by one of the arrestees at the dock. However, when a government agent placed the telephone call to the room at three o'clock in the morning and informed an occupant that things had gone wrong at the vessel, that people had been arrested, and that it would be best if he left the area, the occupant responded, "What happened?" and almost immediately the door of the room opened and the occupants started to leave. We believe that this unusual reaction to a three AM telephone call alluding to rather specific activities could have led a "prudent man" to believe that the occupants were involved in the criminal enterprise involving the ship. The officers thus had probable cause to effectuate the warrantless arrests.
 
 
 18
 If the officers had waited until the suspects emerged into the hallway of the motel to make their arrests, the existence of probable cause, alone, would have provided the officers with authority for their actions since no warrant is required to support an arrest in public. United States v. Watson, 423 U.S. 411, 417, & 418 n. 6, 96 S.Ct. 820, 824 & 825 n. 6, 46 L.Ed.2d 598 (1976). By itself, however, probable cause does not justify warrantless arrests in private living quarters. It is now a well-settled premise that, "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980). This protection likely extends to a lessee of a motel room. See Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (search warrant generally required for search of a hotel room); see also United States v. Baldacchino, 762 F.2d 170, 175-76 (1st Cir.1985) (assuming same right of privacy for purposes of a warrantless arrest in motel room as in private home); United States v. Bulman, 667 F.2d 1374, 1383-84 (11th Cir.) (holding the same), cert. denied, 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982). Thus, we can uphold the arrests in room 106 only if the officers were forced to enter the room to effectuate the arrests due to exigent circumstances.
 
 
 19
 Exigent circumstances occur when a reasonable officer could believe that to delay acting to obtain a warrant would, in all likelihood, permanently frustrate an important police objective, such as to prevent the destruction of evidence relating to criminal activity or to secure an arrest before a suspect can commit further serious harm. See United States v. Santana, 427 U.S. 38, 42-43, 96 S.Ct. 2406, 2409-10, 49 L.Ed.2d 300 (1976) ("hot pursuit" of probable felon); Schmerber v. California, 384 U.S. 757, 766-72, 86 S.Ct. 1826, 1833-37, 16 L.Ed.2d 908 (1966) (blood test incident to an arrest to secure evidence of drunken driving); United States v. Cresta, 825 F.2d 538, 553 (1st Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988); cf. Welsh v. Wisconsin, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (no exigent circumstance to enter home to arrest for civil, nonjailable offense). We believe such circumstances were present when the officers entered room 106. In light of the timing of the suspects' attempted departure, it was reasonably apparent to the officers when the door to that room opened that the suspects were attempting to flee due to their involvement in a serious felony. While we may theorize in retrospect that the officers could have waited for each suspect to cross the threshold of the door, we recognize that under the pressures of the moment such a course might well have endangered the agents: witnessing the arrest of one of their group right outside the door could have caused the remaining suspects to feel trapped and to react violently to the clear and imminent threat of arrest and lengthy incarceration. The safest and most prudent course to take was the one chosen by the agents: once the suspects opened the door and it was clear that they were leaving, the agents entered at once to surprise the entire group and to minimize the chance of any successful attempt to resist violently the arrests. While we might be more critical of this approach in the context of a private dwelling, we note here that the intrusion into the suspect's realm of privacy was not as great. The entry was into a motel room after the door had been opened as the occupants were leaving the premises.
 
 IV
 
 20
 Appellants next challenge the warrantless seizure from room 106 of the key to room 204 of the Susse Chalet.[3] Since we have determined that the agents were legitimately in the motel room at the time of arrest, we will uphold the seizure under the "plain view" doctrine if the agents had probable cause at the time they seized the key to believe that it was evidence pertaining to a crime. Arizona v. Hicks, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); see also Coolidge v. New Hampshire, 403 U.S. 443, 464-73, 91 S.Ct. 2022, 2037-42, 29 L.Ed.2d 564 (1971); Emery v. Holmes, 824 F.2d 143, 148-49 (1st Cir.1987).
 
 
 21
 The circumstances surrounding the seizure of the key in this case satisfy this "plain view" standard. At the time of the seizure, other agents had just arrested two individuals attempting to carry away a large quantity of cocaine from a nearby ship. The agents in room 106 knew of the earlier arrests and had reasonably concluded that the three individuals they were arresting in room 106 were cohorts of those captured at the dock. Since both suspicious vehicles observed during the preceding days had out-of-state registration, the agents deduced that the individuals arrested at the ship were also staying in a motel room, but that all five could not be lodgers of room 106. Therefore, the agents could quite reasonably have concluded, with some certainty, that the motel room key found in room 106 would lead them to the room of the arrestees' cohorts. The agents thus had probable cause to seize the key as likely evidence of the crime they were investigating.[4]
 
 V
 
 22
 Finally, all appellants question whether the evidence presented at trial was sufficient to convict them. As a preliminary matter, we note that these challenges require us to determine whether the evidence, when viewed in the light most favorable to the government, could lead a reasonable juror to conclude that each defendant was guilty beyond a reasonable doubt. United States v. Molinares Charris, 822 F.2d at 1218. We note also that Miller argues only that if certain evidence was suppressed as fruits off an illegal search or arrest, then the evidence against him was insufficient. Since we have concluded that all evidence was properly seized, we need consider his claim of insufficiency no further. We thus now appraise, in turn, the evidence against each of the other defendants.
 
 Sigifredo Gonzalez Lenis
 
 23
 The evidence against this defendant was overwhelming. We summarize. Government agents observed two suspects dressed in black receiving a duffel bag from a ship which the agents reasonably believed contained cocaine. One agent was able to see the face of the taller of the two suspects and later identified him as Sigifredo. The agents observed the two suspects running into the tank farm area of the docks. Five to ten minutes later Sigifredo and Rengifo were apprehended in that area, dressed in black and crawling on their stomachs toward a hole in a fence. Fifteen feet from Sigifredo and six feet from Rengifo were two duffel bags containing 55 kilograms of cocaine. This evidence alone was sufficient to convict Sigifredo of both importation and possession with intent to distribute the cocaine.
 
 
 24
 Additionally, agents found in room 106 of the Howard Johnson Inn, where the three other suspects were arrested, the key to room 204 of the Susse Chalet. That room was registered to Sigifredo for double occupancy. The agents found in that room a sketch of the port area and the Margranel and a piece of paper with a partially illegible telephone number and "106" written on it. The telephone number appeared to be that of the Howard Johnson Inn. One of the suspects in room 106, Miller Gonzalez Lenis, had a list identifying the packages in the duffel bags seized at the dock. This evidence considered together tied Sigifredo's activities with those of the other suspects, showing purposeful participation in a common purpose and plan to undertake the criminal enterprise. See United States v. Paradis, 802 F.2d 553, 559 (1st Cir.1986). This evidence thus clearly established the guilt of Sigifredo on the conspiracy charges.
 
 Jorge Rengifo Castro
 
 25
 As to the charges of importation and possession, the evidence against Rengifo was the same as that against Sigifredo except that he was not positively identified as one of the two individuals who received the duffel bags from the ship. He was found, however, 10 minutes after the exchange dressed in black crawling on his stomach six feet from two duffel bags containing 55 kilograms of cocaine. In light of these circumstances, we do not believe the lack of positive identification as one who received the duffel bags from the ship bars a determination that, beyond a reasonable doubt, Rengifo participated in the importation of a huge amount of cocaine which he possessed with intent to distribute.
 
 
 26
 Rengifo's principal complaint regarding his convictions on the conspiracy charges is that the government presented no direct evidence that he participated in or knew of any conspiratorial agreement. However, circumstantial evidence alone can prove the existence of such an agreement. United States v. Bautista, 731 F.2d 97, 101 (1st Cir.1984). The government provided more than a sufficient amount of such evidence at Rengifo's trial. In addition to Rengifo's activities with Sigifredo at the dock, the government showed that his wallet was found in room 204, the same room rented to Sigifredo for double occupancy. Thus, with Rengifo's ties to Sigifredo at both the dock and the motel documented, the jury could have very reasonably applied equally to Rengifo the evidence summarized above showing Sigifredo's involvement in the conspiracy, and concluded that Rengifo was equally a knowing participant in the criminal scheme.[5]
 
 Victor Gonzalez Lenis
 
 27
 No evidence was presented that any of the defendants arrested in room 106 ever possessed the cocaine. We note as a preliminary matter, however, that a coconspirator is responsible for the substantive offenses committed in furtherance of the conspiracy regardless of whether he participates in, or even has knowledge of, those offenses. Pinkerton v. United States, 328 U.S. 640, 645-48, 66 S.Ct. 1180, 1183-85, 90 L.Ed. 1489 (1946). Therefore, the government needed to show only continuing participation by Victor and Orejuela in the conspiracy to import and possess with intent to distribute in order to satisfy its burden regarding their participation in both the conspiracy and the substantive offenses.
 
 
 28
 The evidence, and reasonable inferences therefrom, amply showed Victor's participation in the conspiracies. First, one-half hour after the arrival of the ship, two individuals were observed in a waterfront area near the ship. These individuals departed that area in an automobile later found to be leased to Victor. That vehicle then proceeded to another area from which its occupants viewed the ship. From this evidence the jury could have reasonably concluded that Victor and another individual used Victor's leased automobile to reconnoiter the ship and the dock area, and thus better prepare a plan for offloading the cocaine. Second, Victor was one of three individuals found in room 106 of the Howard Johnson Inn, attempting to leave immediately after one of the occupants received a telephone call informing him that something had gone wrong at the ship. That call was placed soon after Sigifredo and Rengifo were captured near the Margranel. From this, the jury could have concluded that Victor was aware of the activities of Sigifredo and Rengifo at the ship, and that he was hurriedly leaving the room because he also feared being caught due to his involvement in the conspiracy. Third, at the time of his arrest, Victor apparently claimed that the key found in room 106, the key to room 204 in the Susse Chalet, was the key to his room. Room 204 was rented to Sigifredo for two individuals. It contained a sketched map of the dock area and the ship. Thus, the jury could have concluded that Victor was closely associated not only with one of the individuals caught veritably red-handed with the cocaine but also with the scheme to offload the cocaine. Finally, Victor's identification showed him to be a resident of Flushing, New York. Since apparently there was no evidence presented suggesting he had a reason independent of the other codefendants, with whom he was seized, to be in Warwick, Rhode Island, the jury could have concluded that his motive for being there was the same as the other codefendants. We believe this evidence could have convinced a reasonable juror "beyond a reasonable doubt [that there was] at least a slight, though willing and knowing, connection between [the] defendant and [the] conspiracy." United States v. Marsh, 747 F.2d 7, 13 (1st Cir.1984).
 
 Aldemar Orejuela
 
 29
 The evidence against Orejuela is summarized as follows. One day after the arrival of the Margranel agents observed Orejuela's automobile containing himself and another individual parked within 100 yards of that ship. Both men then got out of the car and observed the Margranel for approximately one minute. Approximately twenty minutes after the individuals left in Orejuela's automobile, he was seen standing approximately 300 yards from the ship. Later that same day, Orejuela was seen driving his automobile with two passengers, circling the parking lots of both the Howard Johnson Inn and the Susse Chalet. He was seen again later that day driving with Victor and Miller to the Howard Johnson Inn. At approximately 1:00 AM the next morning his car was seen leaving that motel and then in the port area. The car returned to the motel fifteen minutes later. Orejuela and Miller were immediately thereafter seen in the hallway of the motel near room 106. Less than two hours later, after the telephone call by the agents to room 106, Orejuela was found in that room, on the bed fully clothed, while Victor and Miller Gonzalez were heading for the door. Agents subsequently searched his car and found a pair of binoculars. Like all defendants except Miller Gonzalez, Orejuela had a New York address.
 
 
 30
 The evidence against Orejuela was perhaps the least persuasive of that against any of the defendants who were convicted. Whereas Victor told agents his room was the same room later found to contain the sketch of the Margranel and the dock area and to be registered to Sigifredo, and Miller had on his person papers identifying by code the individual bags of cocaine which Sigifredo and Rengifo attempted to remove from the dock area, the government introduced no evidence at trial directly linking Orejuela with Sigifredo and Rengifo, with their activities at the dock area, or with room 204 of the Susse Chalet and the incriminating evidence contained therein. Furthermore, while Victor and Miller were caught attempting to flee room 106 after the agent's bogus warning telephone call, Orejuela apparently still was lying on the motel bed until the agents burst into the room.
 
 
 31
 Admittedly, then, the bulk of the evidence against Orejuela suggests guilt only by association. He was seen on several occasions with Victor and Miller, in his car, near the motels, and on the night the three were arrested. Of course, "[a] showing that the defendant merely associated with those participating in a conspiracy is insufficient" to sustain a conspiracy conviction. United States v. Jackson, 700 F.2d 181, 185 (5th Cir.), cert. denied, 464 U.S. 842, 104 S.Ct. 139, 78 L.Ed.2d 132 (1983). While association with conspirators is evidence of participation in the conspiracy, see United States v. Abou-Saada, 785 F.2d 1, 9-10 (1st Cir.), cert. denied, 477 U.S. 908, 106 S.Ct. 3283, 91 L.Ed.2d 572 (1986), something more is needed to show beyond a reasonable doubt the "deliberate, knowing, and specific intent" of the defendant to join the conspiracy. United States v. Basey, 816 F.2d 980, 1002 (5th Cir.1987).
 
 
 32
 In Orejuela's case, the government provided that additional and required evidence by showing that Orejuela on at least two occasions was seen observing the Margranel prior to the offload of the cocaine. Furthermore, government agents observed him circling the parking lots of the motels in which the conspirators were staying. This evidence could have led the jurors to reasonably conclude that Orejuela at least was conducting surveillance of the ship area and the parking lots, attempting (albeit unsuccessfully) to ascertain whether government officials were watching the activities of the conspirators. If the jury so concluded, then they easily could have found beyond a reasonable doubt that Orejuela was an active member of the conspiracy.
 
 
 33
 The convictions of the appellants are affirmed.
 
 
 
 *
 Of the Ninth Circuit, sitting by designation
 
 
 [1]
 21 U.S.C. Secs. 952(a), 960(b)(1), 21 U.S.C. Secs. 841(a)(1), (b)(1)(A), 21 U.S.C. Sec. 963 and 21 U.S.C. Sec. 846, respectively
 
 
 [2]
 The three Gonzalez Lenis appellants are brothers. For ease of identification, we will refer to these individuals by their first name
 
 
 [3]
 Appellants' additional argument, made only orally before this court, that the warrantless and thus illegal initial search of room 204 required suppression of the evidence later seized pursuant to a warrant, even though the warrant was obtained without any reliance on information obtained by the initial search, is clearly without merit. The Supreme Court has recently held specifically that suppression of evidence is not required under these identical circumstances. See Murray v. United States, --- U.S. ----, 108 S.Ct. 2529, 101 L.Ed.2d 472 (U.S.1988)
 
 
 [4]
 Appellants' remaining arguments regarding the inadmissibility of certain evidence are based primarily on their claim that the arrests were illegal. In light of the above discussion, these arguments are without merit
 
 
 [5]
 In light of this discussion, it is clear that Rengifo's related arguments that the district court improperly denied his motions for a judgment of acquittal and a new trial are without merit