**STATE of Utah, Plaintiff and Appellee,**

v.

**Michael Dean BEAVERS, Defendant and Appellant.**

No. 920056–CA.

Court of Appeals of Utah.

Aug. 13, 1993.

Ronald S. Fujino and Roger K. Scowcroft, Salt Lake City, for defendant and appellant.

Jan Graham and Christine F. Soltis, Salt Lake City, for plaintiff and appellee.

Before BILLINGS, GARFF and ORME, JJ.

## OPINION

ORME, Judge:

Defendant appeals his convictions for theft, a second degree felony, in violation of Utah Code Ann. § 76–6–404 (1990) and burglary, a third degree felony, in violation of Utah Code Ann. § 76–6–202 (1990). He contends that police acquired evidence by way of a constitutionally improper, war-

rantless seizure and that the trial court therefore erred in denying his motion to suppress evidence. We agree and reverse.

## FACTS

In the early morning of November 12, 1990, burglars threw a shopping cart through the window of a Banana Republic store and removed fifty-two coats. Shortly thereafter, defendant and two others allegedly delivered armfuls of coats to Michael Nichols's apartment nearby. After storing the coats, all four purportedly drove to a Mr. Mac clothing store several miles away. Defendant allegedly backed a car through the front door of the store, and the group grabbed thirty-nine leather coats. Those coats were stored with the Banana Republic coats at Nichols's apartment.

Later that morning, at approximately 10:00 a.m., police responded to a call from the manager of Nichols's apartment complex. The manager reported a loud argument coming from Nichols's apartment, apartment 4B. He reported an apparent assault during which he overheard someone say "Don't kill me," or words to that effect. Officer Humphries and Trainee Beger, along with their backup, Officer Foster, met with the manager upon arrival at the scene. The manager confirmed the information he initially reported and explained that he had seen two males enter the apartment earlier that morning, although he did not believe the renter was home. He provided the license number and a description of the car that had dropped off the two visitors. The manager further reported that apartment 4B had been broken into the previous night and a television set was reported missing. He then directed the officers to apartment 4B, a second story apartment.

From the top of the stairway, the officers could hear the voices of males arguing in the apartment. Upon arrival at the apartment, the officers noticed that the latching mechanism and door jam had been broken and the door was open a few inches.[1] Without alerting the occupants,

---

1. Nothing the police observed initially indicated that the occupants were the television thieves of

Officer Humphries and Trainee Beger assumed positions on each side of the apartment door while Officer Foster remained in the stairway. The officers listened for two to four minutes, during which time they heard an argument over the price of coats. What they heard promptly obviated their concerns about violence in progress, but at the same time was of considerable interest. At the suppression hearing, Officer Humphries testified:

> The one individual was saying he wanted to take the coat, show the coat. "I will give you $10 and I will be back later." The other voice was objecting to that arrangement, was saying, "No, you are not leaving with the coat. I am not going to let you walk with the coat for $10."

> A third party at one point in time interjected that—something to the effect, "They have got a lot of coats in there. You have seen the coats they have in there." Or something to that effect.

A moment later, Officer Humphries overheard the person who wanted to take the coat, later identified as Dexter Davis, say "Well, I am leaving. I will see you later." Davis then stepped through the door of the apartment into the hallway, carrying a new coat. As soon as he saw the officers, he exclaimed "Oh, shit" and stepped back across the threshold about a half an arm length into the apartment. Officer Humphries reached across the threshold into the apartment, grabbed Davis's shoulder, flipped his legs out from under him, and placed him in a prone position on the ground. As he reached for Davis, Officer Humphries saw two black males and a black female through the open door. There was no sign of the renter, based on information received from the manager that he was a white male. Officer Humphries observed one of the men fumbling with a pile of clothes on the floor while the other two persons fled from sight. These movements, which occurred after Davis had been seized, caused Officer Humphries to fear for the safety of the officers present. He called for Officer Foster, whereupon the two entered the apartment with guns drawn. They ordered two of the occupants into prone positions on the floor and seized the third. When Officer Humphries checked the rest of the apartment for other individuals, he observed a "large number of new coats hanging in closets." [2]

Two other officers arrived, responding to a call for assistance. One of these officers left the scene to obtain a search warrant for apartment 4B. The other officer learned from people at the scene that the defendant had placed some jackets in the back of his girlfriend's car and left in that car with his girlfriend, Ms. Buzzard, for her house on 10th East. Several officers were dispatched to that location. One of those officers, Officer Brown, knocked and asked Ms. Buzzard if defendant was there. She responded he was and went to get him. Officer Brown, without her permission, followed Ms. Buzzard into the apartment and arrested defendant:

Immediately after the arrest, Officer Atkinson, supervisor of the burglary unit, explained to Ms. Buzzard the reason for defendant's arrest and requested permission to search the house and her car. Ms. Buzzard gave permission for those searches. The police found several coats in the room defendant had been using and immediately thereafter questioned defendant in a police car without informing him of his *Miranda* rights. Defendant admitted there were coats in Ms. Buzzard's car, and, after their discussion with defendant, the police found thirteen stolen coats in her car.

Defendant and codefendant Anthony Harris were charged with theft, a second degree felony, *see* Utah Code Ann. § 76–6–404 (1990), and burglary, a third degree felony, *see* Utah Code Ann. § 76–6–202

---

the previous night who had daringly stayed on to use the apartments, as opposed to invited guests of the renter, who was temporarily absent.

**2.** By the State's own admission at the suppression hearing, "[i]t wasn't until [the officers] were in the apartment that [Officer Humphries] recalled the Banana Republic burglary," from his early morning briefing.

(1990), in connection with the incidents at the Banana Republic and Mr. Mac stores. After a hearing, the trial court denied defendant's motion to suppress all evidence obtained against him with the exception of the statements he made to police without the benefit of *Miranda* warnings. All evidence of the statements was ordered suppressed. The court specifically concluded: 1) the initial entry into apartment 4B was reasonable because Davis might have had a weapon and police reasonably believed that their safety was threatened by his retreat into the apartment; 2) the further intrusion and safety sweep of the apartment were also justified by reasonable safety concerns; 3) although defendant's arrest at his girlfriend's residence was unreasonable, none of the evidence flowed from that arrest or, apparently, any search merely incident thereto; 4) the coats in the girlfriend's residence and car were discovered by way of consensual searches based on information received at apartment 4B; and 5) defendant's statement that coats could be found in his girlfriend's car was illegally obtained for lack of *Miranda* warnings.

The court granted defendant's motion to sever his trial from that of Anthony Harris, but denied his motion to sever charges related to the Banana Republic store from those related to the Mr. Mac store. The jury acquitted defendant of the Banana Republic felony offenses, but convicted him of theft by receiving goods taken in the Banana Republic burglary, a class B misdemeanor, and convicted him of the Mr. Mac burglary and theft.

Defendant appeals the trial court's denial of his motion to suppress because he asserts the warrantless entry into apartment 4B and the warrantless seizure of Dexter Davis were unreasonable under the Fourth Amendment to the Federal Constitution and Article I, § 14, of the Utah Constitution.[3] Defendant further argues that even if the initial entry into apartment 4B was legal, the court erred in not suppressing evidence discovered in Ms. Buzzard's resi-

dence and car because those items were fruits of Officer Brown's illegal entry into her home. Finally, defendant contends that the court erred by not severing the charges related to Banana Republic from those related to Mr. Mac. Our conclusion that the initial entry into the apartment and seizure of Davis violated the Fourth Amendment renders our consideration of the other issues raised on appeal unnecessary.

## STANDARD OF REVIEW

We will disturb a trial court's factual findings on a motion to suppress evidence only if those findings are clearly erroneous, but we review a court's legal conclusions based upon those findings under a nondeferential correction of error standard. *See, e.g., State v. Thurman*, 846 P.2d 1256, 1270–71 & n. 11 (Utah 1993); *State v. Strickling*, 844 P.2d 979, 981 (Utah App.1992); *State v. Godina–Luna*, 826 P.2d 652, 654 (Utah App.1992). In the present case, neither party disputes the factual findings which underlie the court's legal conclusion that Officer Humphries's warrantless seizure of Davis at apartment 4B was reasonable. Instead, defendant contends, given the facts of this case, the court reached its conclusion by applying the law incorrectly. We accordingly review the court's application of Fourth Amendment principles to the undisputed facts of this case.

## ANALYSIS

The State claims that Officer Humphries possessed reasonable suspicion, or perhaps even probable cause, to believe Davis and the others in apartment 4B were involved in criminal activity and that he reasonably feared for his safety when Davis retreated into the apartment. According to the State, reasonable suspicion or probable cause, together with the exigency of his fear for safety, provided a permissible basis for Officer Humphries's warrantless entry into apartment 4B and his seizure of

---

**3.** At the suppression hearing, the State waived any standing argument it might have concern-

ing defendant's Fourth Amendment claims.

Davis. The thrust of the State's argument is that even if Officer Humphries did not have probable cause, his actions were nevertheless justified because he reached into apartment 4B in order to effect an investigatory *Terry* stop on the basis of reasonable, articulable suspicion that Davis was engaged in criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 20–23, 88 S.Ct. 1868, 1879–81, 20 L.Ed.2d 889 (1968).

The State further contends that if Officer Humphries's initial seizure of Davis was constitutionally permissible, then the subsequent protective sweep, *see Maryland v. Buie*, 494 U.S. 325, 335–337, 110 S.Ct. 1093, 1099–1100, 108 L.Ed.2d 276 (1990), the ensuing discovery of the stolen coats, the issuance of a search warrant for apartment 4B, defendant's arrest, and the discovery of additional coats in Ms. Buzzard's car were all lawful. On the other hand, as the State originally conceded, if the police entered the apartment and seized Davis illegally, all subsequently seized evidence would be fruits of the illegality.[4]

### A. Reasonable Suspicion as a Basis for Warrantless Entry

Given the thrust of the State's argument, the primary issue before us is whether the Fourth Amendment permits a warrantless entry into a private residence on the basis of reasonable, articulable suspicion—the level of suspicion necessary to justify an investigatory *Terry* stop—or whether such an entry is justified solely on the basis of probable cause *and* exigent circumstances.

■ The Fourth Amendment guaranties "[t]he right of the people to be secure in their persons [and] houses ... against unreasonable searches and seizures." When police make a seizure, Fourth Amendment analysis begins with an assessment of whether that seizure occurred in a place where a person has a reasonable expectation of privacy. *State v. Brown*, 853

P.2d 851, 855 (Utah 1992). When Davis emerged briefly into the common hallway, he had a diminished expectation of privacy, *see United States v. Barrios–Moriera*, 872 F.2d 12, 14 (2nd Cir.), *cert. denied*, 493 U.S. 953, 110 S.Ct. 364, 107 L.Ed.2d 350 (1989), and the police were therefore free to make an investigatory stop if they had reasonable articulable suspicion that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 20–23, 30, 88 S.Ct. 1868, 1879–81, 1884, 20 L.Ed.2d 889 (1968). However, the undisputed factual findings indicate that Officer Humphries reached across the threshold of apartment 4B to seize the retreating Davis. Thus, the seizure occurred within the constitutionally protected confines of a private residence, where citizens enjoy a heightened expectation of privacy.

■ "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972). Consequently, warrantless searches and seizures within a home or other private premises are per se unreasonable absent exigent circumstances. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *Payton v. New York*, 445 U.S. 573, 586–87, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980); *Brown*, 853 P.2d 851. "Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton*, 445 U.S. at 590, 100 S.Ct. at 1382.

■ The State bears the particularly heavy burden of proving the warrantless entry into a home falls within the exigent circumstances exception to the warrant requirement. *Welsh v. Wisconsin*, 466 U.S. 740, 749–50, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984); *State v. Ramirez*, 814 P.2d 1131, 1133 (Utah App.1991). Even

---

**4.** At the suppression hearing, the State recognized that "if the entry were declared illegal, [the State] would probably lose all evidence that links [defendant] to this burglary and theft." Although the State argues on appeal that its view at the hearing was mistaken, we agree with its initial assertion that the subsequent discover-

ies were not sufficiently attenuated from the entry of the apartment to survive a determination that the entry and initial seizure of Davis were illegal. *See Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963); *State v. Arroyo*, 796 P.2d 684, 689–92 (Utah 1990).

when exigent circumstances exist the Fourth Amendment always requires probable cause as a basis for entry into a private residence. *Payton v. New York*, 445 U.S. 573, 587–89, 100 S.Ct. 1371, 1381, 63 L.Ed.2d 639 (1980); *United States v. Lindsey*, 877 F.2d 777, 780 (9th Cir.1989); *United States v. Socey*, 846 F.2d 1439, 1444 n. 5 (D.C.Cir.), *cert. denied*, 488 U.S. 858, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988). *See also State v. Ashe*, 745 P.2d 1255, 1259 (Utah 1987) (probable cause *and* exigent circumstances justified warrantless entry into a home). Despite this two-fold requirement for warrantless entry, the State argues that, under the "hot pursuit" exception to the warrant requirement, entry into private premises is permissible by merely showing police had articulable suspicion.[5] We disagree.

The United States Supreme Court has held "that a suspect may not defeat an arrest which has been set in motion in a public place ... by the expedient of escaping to a private place." *United States v. Santana*, 427 U.S. 38, 43, 96 S.Ct. 2406, 2410, 49 L.Ed.2d 300 (1976). *Accord State v. Ramirez*, 814 P.2d 1131, 1134 (Utah App. 1991). In *Santana*, police had probable cause to arrest defendant on the basis of a just-completed drug buy. Upon finding the defendant standing at the threshold to her house, in an area the Court ruled was a public place, police attempted to stop her, whereupon she retreated into the house. *Santana*, 427 U.S. at 40, 96 S.Ct. at 2408. Police followed her into the house, seized

her, and found heroin and cash with serial numbers matching that used in the drug buy. *Id.* at 40–41, 96 S.Ct. at 2408–09. The Court reasoned that the hot pursuit into defendant's house was justifiable because the police lawfully initiated the arrest in a public place based on probable cause, *id.* at 42, 96 S.Ct. at 2409, and because there was "a realistic expectation that any delay would result in destruction of evidence." *Id.* at 43, 96 S.Ct. at 2410.

Some courts have extended the hot pursuit doctrine to *Terry* stops. *See, e.g., United States v. Pace*, 898 F.2d 1218, 1229 (7th Cir.) (following car of would-be assassin into his parking garage), *cert. denied*, 497 U.S. 1030, 110 S.Ct. 3286, 111 L.Ed.2d 795 (1990), *and*, 498 U.S. 878, 111 S.Ct. 210, 112 L.Ed.2d 170 (1990); *Harbin v. City of Alexandria*, 712 F.Supp. 67, 72 (E.D.Va. 1989) (police verbally stopping suspect inside house from position on front porch), *aff'd*, 908 F.2d 967 (4th Cir.1990); *Edwards v. United States*, 364 A.2d 1209, 1214 (D.C.App.1976) (chasing suspects into house) (*Edwards I*), *aff'd on other grounds*, 379 A.2d 976 (D.C.App.1977) (en banc) (*Edwards II*); *People v. Rivera*, 233 Ill.App.3d 69, 174 Ill.Dec. 226, 231, 598 N.E.2d 423, 428 (1992) (chasing suspect from public area of bar to private basement area); *State v. Penas*, 200 Neb. 387, 263 N.W.2d 835, 836–37 (1978) (traffic misdemeanor suspect pulled from home).[6] Of these cases, *Edwards I* is the most frequently cited as support for the proposition that police may make a warrantless entry

---

5. The State's contention that the "hot pursuit" doctrine applies here is tenuous given that little more than a nanosecond elapsed between the time pursuit began and ended.

6. Several of these cases are distinguishable from the facts of the case before us and are not applicable to the specific issue we must consider—whether articulable suspicion justified police entry into a private residence. In *United States v. Pace*, 898 F.2d 1218, 1228–29 (7th Cir. 1990), reasonable suspicion that the suspect was on his way to make an attempt on someone's life outweighed the intrusion into a condominium parking garage, even though it was within the curtilage of a private residence. In *Harbin v. City of Alexandria*, 712 F.Supp. 67, 72 (E.D.Va.1989), the plaintiff in a civil rights suit had retreated into his house and police

"stopped" him by calling through the open front door, but police did not seize him until he came onto the front porch. Finally, in our view, *State v. Penas*, 200 Neb. 387, 263 N.W.2d 835, 836 (1978), a case where police reached across the threshold of defendant's house to seize him and investigate his suspected drunk driving, would have been decided differently in light of *Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). In *Welsh*, the Supreme Court held the warrantless seizure of defendant in his home for driving while intoxicated was unreasonable, declaring that "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is *probable cause* to believe that only a minor offense ... has been committed." *Id.* at 753, 104 S.Ct. at 2099 (emphasis added).

into private premises for the purpose of completing a lawful *Terry* stop premised solely on reasonable suspicion.

In *Edwards I,* police patrolling a residential neighborhood late at night noticed defendant and his companion carrying electronic sound equipment and a bedsheet stuffed with unknown goods. The sheet was marked in the manner employed by the nursery facility attended by the son of one of the officers. *Edwards I,* 364 A.2d at 1212. When police approached the pair they ran. The officers chased them up a flight of stairs and followed them through a door, which had been slammed and left unlocked, into defendant's apartment. The *Edwards I* panel read

> the gravamen of the Court's holding in *Santana* to be that when a citizen has knowingly placed himself in a public place *and valid police action is commenced in that public place,* the citizen cannot thwart that police action by then fleeing into a private place.

*Id.* at 1214 (emphasis added). While acknowledging that police must generally have probable cause to make a warrantless entry into a dwelling to arrest someone or to seize contraband, the *Edwards I* court viewed the facts before it "as presenting quite a different situation requiring the application of a rule of reason" which justified the warrantless entry. *Id.*

As a jurisprudential matter, we do not view *Edwards I* as viable precedent for the proposition that warrantless entries into private premises can be justified solely on the basis of reasonable suspicion. While the District of Columbia Court of Appeals affirmed the result of *Edwards I* en banc, it did so by concluding that police had probable cause to arrest defendants at the outset of the chase and their entry into the apartment was justified under *Santana. Edwards II,* 379 A.2d at 978–79. Thus, the extension of the hot pursuit doctrine to

*Terry* stops by the *Edwards I* panel was rendered dicta, at best, by the en banc decision.

More importantly, we believe the *Edwards I* panel misinterpreted the *Santana* decision. We view the *Santana* Court's articulation of the hot pursuit doctrine as nothing more than a specific application of the general rule that a warrantless entry of a private residence must be justified by probable cause *and* exigent circumstances. Nowhere in *Santana* did the Court hint it was expanding the application of this rule to circumstances amounting to less than probable cause. In fact, as noted above, the *Santana* Court, by its own language, based its decision on the facts that the police possessed probable cause to arrest defendant and defendant's action created an exigency whereby evidence of a serious crime would have been destroyed had police delayed their pursuit. *Santana,* 427 U.S. at 42–43, 96 S.Ct. at 2409–10.

By expanding the *Santana* exception to *Terry* stops, the *Edwards I* panel disregarded the Supreme Court's directive that exceptions to the warrant requirement should be few in number, carefully delineated, and jealously drawn. *See Welsh v. Wisconsin,* 466 U.S. 740, 749, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984); *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971); *State v. Ashe,* 745 P.2d 1255, 1258 (Utah 1987). Moreover, in *Welsh* the Supreme Court narrowed rather than expanded *Santana*'s carefully delineated exception to the warrant requirement by holding that, despite the State's claim that potential loss of evidence constituted exigent circumstances, police entry into a home to arrest a suspected drunk driver was unconstitutional, notwithstanding the existence of outright probable cause, because the suspected offense was "minor."[7] *Welsh,* 466 U.S. at

---

7. The Court's characterization of drunk driving as minor in the context of considering an intrusion into the sanctity of a home is especially significant given that drunk driving is hardly a minor matter in absolute terms. *See, e.g., Michigan v. Sitz,* 496 U.S. 444, 451, 455, 110 S.Ct. 2481, 2485–86, 2488, 110 L.Ed.2d 412 (1990)

(because "[d]runk drivers cause an annual death toll of over 25,000 and in the same time span cause nearly one million personal injuries and more than five billion dollars in property damage," state interest in preventing harm outweighed level of intrusion required for random roadblocks) (footnote omitted) (quoting 4

753, 104 S.Ct. at 2099. *See also supra* note 6. The Court reasoned that the government's interest in arresting defendant for a minor offense was insufficient to overcome the presumption of unreasonableness attached to the warrantless search of a home.[8] *Welsh*, 466 U.S. at 750–54, 104 S.Ct. at 2098–2100.

Although the Supreme Court has not directly addressed the application of *Terry* principles to warrantless entries of a home,[9] the Eleventh Circuit Court of Appeals, apparently discerning extensive discussion unnecessary, unequivocally concluded that "[t]he *Terry* analysis does not apply to intrusion into the home ... because an individual's residence enjoys special protection under the Fourth Amendment." *United States v. Tobin*, 890 F.2d 319, 327 (11th Cir.1989), *vacated*, 902 F.2d 821 (11th Cir.1990) (en banc) (granting rehearing). Although the original panel's decision was vacated, the Eleventh Circuit, in an en banc opinion following rehearing, noted the original panel's view regarding extension of *Terry* principles and agreed that "[r]easonable suspicion cannot justify the warrantless search of a house." *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir.) (en banc) (police entry into home justified because probable cause and exigent circumstances existed), *cert. de-*

nied, —— U.S. ——, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991). Still another court has explicitly refused to "extend the scope of a *Terry* protective search into the private recesses of one's dwelling when an officer stands at the threshold with merely reasonable suspicion to support an investigation." *State v. Davis*, 295 Or. 227, 666 P.2d 802, 812 (1983) (en banc).

In *Davis*, police responded to a reported fight at a motel. *Id.* 666 P.2d at 804. Upon arrival, police were informed that there was an ongoing rape in a specific room, but when police knocked on the door the purported victim emerged fully clothed and apparently unfrightened. Police talked with defendant for a moment and noticed an empty holster protruding from a backpack on the bed. *Id.* The officers restrained defendant in the motel room and in the ensuing search found a gun and drugs.

Noting that any emergency with respect to the woman had clearly ended, the *Davis* court rejected the State's claims that an emergency required police to enter and search the room for their own safety and that the search was justified on the basis of reasonable suspicion. The court reasoned:

> The state attempts to bootstrap the police officers' entry into Defendant's room by merging two independent doc-

---

Wayne R. LaFave, *Search and Seizure* § 10.8(d), at 71 (2d ed. 1987)).

**8.** In *State v. Hamilton*, 710 P.2d 174 (Utah 1985), the Utah Supreme Court upheld a conviction for a traffic offense where police arrested a motorist after they observed him fail to yield the right-of-way, drive onto private property, and lock himself into a storage shed. *Id.* at 175. However, the court took pains to note there was "no indication that the premises constituted the defendant's residence." *Id.*

**9.** In an analogous situation, the United States Supreme Court refused to allow a seizure under the plain view doctrine on the basis of reasonable suspicion. In *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), police were lawfully present, albeit without a search warrant, in defendant's apartment. An officer, suspecting it was stolen, moved stereo equipment in plain view to inspect the serial number. *Id.* at 323–24, 107 S.Ct. at 1152. The State admitted he had only reasonable suspicion as a basis for moving the equipment. *Id.* at 326,

107 S.Ct. at 1153. Justice Scalia, writing for the Court, explained:

> We now hold that probable cause is required [to invoke the plain view doctrine]. To say otherwise would be to cut the "plain view" doctrine loose from its theoretical and practical moorings.... Dispensing with the need for a warrant is worlds apart from permitting a lesser standard of *cause* for the seizure than a warrant would require, *i.e.*, the standard of probable cause....
>
> ....
>
> .... A dwelling-place search, no less than a dwelling-place seizure, requires probable cause, and there is no reason in theory or practicality why application of the "plain view" doctrine would supplant that requirement.

*Id.* at 326–28, 107 S.Ct. at 1153–54 (emphasis in original). Likewise here, we are unwilling to cut the probable cause and exigent circumstances exception loose from its constitutional moorings, thereby creating an altogether new exception to the warrant requirement.

trines i.e., the stop and frisk doctrine with the emergency doctrine, in order to fill the gaps of one doctrine with the arguably permissible scope of another. Thus, their "emergency" or exigent circumstance, is, in their words, the need to "neutralize" the area for their own protection while carrying on the questioning. We decline the invitation to stretch either of these doctrines in order to justify the police officers' actions based on the facts presented here. Such a modification or blending of the two doctrines would create an exception to the warrant requirement which would effectively swallow the rule.

*Id.* at 812. The court concluded that extending *Terry* to allow police entry into private dwellings [10] would contradict the principle that exceptions to the search requirement be carefully drawn. *Id.*

This reasoning applies to the State's argument in the present case, especially in light of Officer Humphries's testimony that he feared for his safety once he was inside the apartment, yet he never testified that any fear existed before entering the apartment to seize Davis. An entirely new, expansive exception to the search warrant requirement would arise if police could seize citizens in their homes on the basis of reasonable suspicion, and justify further intrusions by a reasonable fear for their safety once inside. Instead of merely expanding the "probable cause plus exigent circumstances" exception as the state would have us believe, permitting such intrusions would create a wholly new, untenably circular "reasonable suspicion and emergencies created by entry" exception.

Furthermore, the rationale for permitting warrantless entries into private residences is totally inapplicable in the *Terry* context. Warrantless entries are justified with *probable cause* and exigent circumstances because in such circumstances, the delay to obtain a search warrant would risk "physical harm to the officers or other persons, the destruction of relevant evidence, [or] the escape of the suspect." *United States v. Lindsey*, 877 F.2d 777, 780 (9th Cir.1989) (quoting *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984)). In contrast, a *Terry* stop is justified on the basis that police should be able to briefly stop citizens to investigate circumstances which lead an officer "reasonably to conclude in light of his experience that criminal activity *may* be afoot." *Terry v. Ohio*, 392 U.S. 1, 20–23, 30, 88 S.Ct. 1868, 1879–81, 1884, 20 L.Ed.2d 889 (1968) (emphasis added). Thus, the only risk that exists if an investigatory stop is not effected is the risk that investigation of *potential* criminal activity might be delayed or, at worst, thwarted altogether. That risk is diminished in the residential setting because the person police wish to question is located in a dwelling that can generally be staked out until the person emerges, if a polite knock at the door fails to produce a suspect willing to voluntarily answer police inquiries.

Accordingly, we reject the State's argument that police can enter a dwelling without a warrant on the basis of reasonable suspicion. An extension of the *Terry* doctrine to warrantless entries of private premises is contrary to Fourth Amendment principles.[11]

We now focus our inquiry on whether the seizure inside apartment 4B was justified under established Fourth Amendment principles. As indicated, both probable cause and exigent circumstances must be shown to validate the entry into the apart-

---

**10.** Significantly, Utah's statute that codified the *Terry* doctrine specifically limits its application to "public place[s]." *See* Utah Code Ann. § 77-7-15 (1990).

**11.** Even if we accepted the State's position, we might still conclude Officer Humphries unlawfully seized Davis. LaFave, who favors the *Edwards I* approach to continuing a *Terry* encounter begun in a public place, nevertheless concludes that "[i]t does not necessarily follow, of

course, that police could in the first instance make a nonconsensual entry of private premises in an effort to confront a suspect they had not already just attempted to stop on the street." 3 Wayne R. LaFave *Search and Seizure* § 9.2(d) at 370 (2d ed. 1987). Nothing in the record indicates Officer Humphries had time to, much less that he attempted to, conduct a *Terry* stop in the hallway.

ment and ensuing seizures and search. Because we readily conclude in the next section that there were no exigent circumstances, we need not consider the separate question of whether probable cause actually existed.

### B. Exigent Circumstances

■ Exigent circumstances are those "that would cause a reasonable person to believe that entry ... was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. McConney,* 728 F.2d 1195, 1199 (9th Cir.), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). "The need for an immediate search must be apparent to the police, and so strong as to outweigh the important protection of individual rights provided by the warrant requirement." *United States v. Robertson,* 606 F.2d 853, 859 (9th Cir.1979).

We can readily dismiss two bases for the existence of exigent circumstances in this case—destruction of evidence and escape of a suspect. Even if police suspected there was a cache of stolen coats in the apartment, they could not reasonably have believed that a quantity of coats would have been destroyed without immediate action. Furthermore, Officer Humphries admitted that he "was not terribly concerned" about the apartment's occupants jumping from the second story window. Accordingly, neither destruction of evidence nor the probability of escaping suspects constituted exigent circumstances.

■ The State argues that police lawfully seized Davis under the exigent circumstance exception to the warrant requirement because they were faced with a "very dangerous scenario." Exigent circumstances which would justify a warrantless entry on that basis

> are those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search until a warrant could be obtained.... There

must be no practical way to avoid these risks and yet follow the Constitution's mandate of detached judicial supervision of such intrusions.

*United States v. Robertson,* 606 F.2d 853, 859 (9th Cir.1979). *See also Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967) (police need not delay warrantless house search "if to do so would gravely endanger their lives"); *State v. Belgard,* 840 P.2d 819, 823–24 (Utah App.1992) (gun in view of police at open door justified police entry into hotel room of known illegal gun dealer). The existence of exigent circumstances must be based on the reasonable belief of the police officer. *See United States v. Rengifo,* 858 F.2d 800, 805 (1st Cir.1988). Any legitimate concern which police claim for their safety must of necessity arise before the challenged entry. *See United States v. Reed,* 935 F.2d 641, 643 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 423, 116 L.Ed.2d 443 (1991). Moreover, police cannot create the exigency in order to justify a warrantless entry. *United States v. Munoz–Guerra,* 788 F.2d 295, 297–98 (5th Cir.1986) (where agents knew that their knocking would create a need for security search, exigent circumstances were of their own making and the search was improper); *People v. Wilson,* 86 Ill. App.3d 637, 42 Ill.Dec. 279, 281–82, 408 N.E.2d 988, 990–91 (1980) (police waiting aside a doorway and shouting "It's the police!" improperly created exigent circumstances). Accordingly, any threat to police safety must have arisen before Officer Humphries made his entry by reaching across the threshold into apartment to seize Davis.

■ The trial court concluded that Davis's detention was necessary to ensure police safety because "Davis may have had a weapon, may have been retreating into the apartment to secure a weapon, or the like." While the court's conclusion may be true (since it only expresses a mere possibility), evidence at the suppression hearing does not indicate the police possessed a reasonable belief that they were in danger. *Cf. United States v. Holzman,* 871 F.2d

1496, 1506–07 (9th Cir.1989) (no exigent circumstances where police did not claim fear for their safety at time of entry into home). Officer Humphries twice reiterated that he feared for his safety in response to the movement of someone inside the apartment. He could observe those movements, however, only after he had crossed the threshold and seized Davis. Consequently, his fear did not arise as a result of Davis's actions and, indeed, did not exist at the time he entered the apartment to seize Davis.

Moreover, Officer Humphries testified that once inside the apartment he did not think to look for weapons. Certainly, an officer who reasonably feared for his safety in response to alleged furtive movements and occupants scurrying about an apartment would consider the presence of weapons. Once the officers observed Davis retreat, had they been concerned for their safety a similar retreat on their part to the nearby stairway, where back-up was in place, would have provided them with protection from the occupants without exposing them to the additional danger that resulted from their intrusion into a strange apartment containing an unknown number of occupants. Other practical means therefore existed to avoid a potentially dangerous situation.

■ The possibility that a person "may have had a weapon, may have been retreating into the apartment to secure a weapon, or the like," cannot justify a warrantless entry into a residence. Instead, a court must determine whether police reasonably believed that they were at substantial risk at the time of the entry. *See Holzman,* 871 F.2d at 1506; *Rengifo,* 858 F.2d at 805. By his own testimony, Officer Humphries never expressed any fear for his safety until after the initial entry had been completed.[12] Accordingly, exigent circumstances could not justify the police intrusion in this case even if probable cause

existed for the entry into the apartment and seizure of Davis.

## CONCLUSION

Police cannot rely on reasonable suspicion as the basis for a warrantless entry into a private residence. Furthermore, since exigent circumstances were not present at the time of the police entry into apartment 4B, that entry was constitutionally impermissible even if probable cause existed. All evidence which flowed from that entry was therefore inadmissible and we reverse the trial court's denial of defendant's motion to suppress. We remand for a new trial or such other proceedings as may now be appropriate.

BILLINGS and GARFF, concur.

---

12. We do not fault the police for performing a protective sweep once they exposed themselves to potential danger inside the apartment. That they took appropriate actions to protect themselves after they improperly entered the apartment does not, however, retroactively justify the improper entry.